Roy Herrera (No. 032901)
Daniel A. Arellano (No. 032304)
**HERRERA ARELLANO LLP**
530 East McDowell Road, Suite 107-150
Phoenix, Arizona 85004-1500
Telephone: (602) 567-4820
roy@ha-firm.com
daniel@ha-firm.com

Aria C. Branch*
Daniel J. Cohen*
Joel Ramirez*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
abranch@elias.law
dcohen@elias.law
jramirez@elias.law

* *Pro Hac Vice* Application
Forthcoming

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Alliance for Retired Americans; Voto Latino; Priorities USA, | No. |
| Plaintiffs, | |
| v. | |
| Katie Hobbs, in her official capacity as Secretary of State for the State of Arizona; Mark Brnovich, in his official capacity as Attorney General for the State of Arizona; Larry Noble, in his official capacity as Apache County Recorder; David Stephens, in his official capacity as Cochise County Recorder; Patty Hansen, in her official capacity as Coconino County Recorder; Sadie Jo Bingham, in her official capacity as Gila County Recorder; Wendy John, in her official capacity as Graham County Recorder; Sharie Milheiro, in her official capacity as Greenlee County Recorder; Richard | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Garcia, in his official capacity as La Paz County Recorder; Stephen Richer, in his official capacity as Maricopa County Recorder; Kristi Blair, in her official capacity as Mohave County Recorder; Michael Sample, in his official capacity as Navajo County Recorder; Gabriella Cázares-Kelly, in her official capacity as Pima County Recorder; Dana Lewis, in her official capacity as Pinal County Recorder; Suzanne Sainz, in her official capacity as Santa Cruz County Recorder; Leslie Hoffman, in her official capacity as Yavapai County Recorder; and Robyn Pouquette, in her official capacity as Yuma County Recorder;

            Defendants.

Plaintiffs Arizona Alliance for Retired Americans, Voto Latino, and Priorities USA, by and through their undersigned counsel, for their Complaint for Declaratory and Injunctive Relief, allege as follows:

## NATURE OF THE CASE

1. On June 6, 2022, Governor Ducey signed into law Senate Bill 1260 ("SB 1260"), which radically alters Arizona law to impose severe restrictions on entirely lawful voters, as well as organizations or individuals that would help them exercise their fundamental right to vote. Plaintiffs challenge three interrelated parts of SB 1260 that will amend Title 16 ("Elections and Electors") of the Arizona Revised Statutes, effective September 24, 2022: A.R.S. § 16-1016(12) (the "Felony Provision"), A.R.S. § 16-165(A)(10) and (B) (the "Cancellation Provision"), and A.R.S. § 16-544(P)–(R) (the "Removal Provision") (collectively, the "Challenged Provisions").[1]

---

[1] References to the Arizona Revised Statutes reflect the codification that will take effect upon Senate Bill 1260's effective date on September 24, 2022.

2. The first Challenged Provision—the Felony Provision—threatens criminal penalties against anyone who knowingly "provides a mechanism for voting" to a person who is registered to vote in another state, regardless of whether that person now lives in Arizona, is eligible to vote in Arizona, and intends to vote only in Arizona. A.R.S. § 16-1016(12). The term "mechanism for voting" is not defined, but the statute expressly emphasizes that it is broad enough to include the mere act of "forwarding an early ballot" addressed to the voter. *Id*. Being registered to vote in more than one state or county is not prohibited, and for good reason. People do not ordinarily think to affirmatively cancel their voter registration when they move, and there often is no obvious or easy way to do so. Nor is there any assurance that a jurisdiction will actually cancel a voter's registration immediately upon receiving a request.

3. The Felony Provision accordingly criminalizes vast swaths of constitutionally protected activity, while simultaneously making it more difficult for entirely lawful Arizona voters to cast a ballot. Certain groups of voters are likely to be more severely burdened, including those who tend to be more residentially transient, such as younger voters, poorer voters, and non-white voters, as well as older voters who move to Arizona to retire. The Felony Provision will make it harder for these voters to exercise their fundamental right to vote, while also threatening with criminal penalties those who would attempt to help them exercise that right.

4. Consider, for example, groups like Plaintiffs that work to assist eligible Arizonans in exercising their fundamental right to vote. If one of Plaintiffs' employees, members, or volunteers helps to register a voter in Arizona and that voter happens also to be registered to vote in another state, then Plaintiffs' employee, member, or volunteer could face criminal penalties under the plain terms of the Felony Provision. Or consider an Arizona parent who receives an early ballot in the mail for their child who just finished college out of state but is eligible to vote in Arizona. That parent could face felony charges if they forward the student's early ballot to them if the student at some point registered to vote in their out-of-

state college town—even if the student has no intention to, and never actually does, vote in two places.

5. The Felony Provision requires Plaintiffs and anyone else conducting voter registration or mobilization activities in Arizona to take an additional step of confirming that the voter they are assisting either has never previously registered to vote anywhere, or has affirmatively canceled any prior registrations before assisting that voter. Otherwise, Plaintiffs risk felony liability for providing such assistance. This risk will severely chill voter registration and mobilization efforts in Arizona, resulting in an undue burden on groups and individuals engaged in these efforts and voters who benefit from them.

6. The second and third Challenged Provisions—the Cancellation and Removal Provisions—force county recorders to cancel a voter's registration and remove a voter from the active early voting list if the voter is registered to vote in another Arizona county. The Cancellation and Removal Provisions do not require county recorders to notify the voter or ask for their consent before canceling their voter registration or removing them from the active early voting list; in fact, they do not require county recorders to make *any* inquiry at all of the voter, including to find out where the voter currently resides and intends to vote. A.R.S. §§ 16-165(A)(10), 16-544(Q). The Removal Provision, moreover, will have a significant impact on the right to vote because the overwhelming majority of Arizonans vote early by mail.

7. The Cancellation and Removal Provisions thus place an undue burden of affirmative cancellation on voters, particularly those who frequently move or change residences, because voters must cancel their other voter registrations if they want to prevent their current voter registration from being canceled or remain on the active early voting list.

8. The Cancellation and Removal Provisions also allow third parties to force county recorders to cancel voter registrations and remove voters from the active early voting list by allowing third parties to provide county recorders with "credible information that a person has registered to vote in a different county." *Id*. §§ 16-165(B), 16-544(R). The

Cancellation and Removal Provisions do not define the term "credible information" or require county recorders to investigate such information. As such, they would appear to allow any person or organization to petition county recorders to cancel voter registrations or remove people from the active early voting list *en masse* by providing "credible information" that those voters have voter registrations in two counties—notwithstanding that it is entirely lawful to be registered to vote in more than one location or that voters with multiple registrations may be intending to legally vote using only one of those registrations. The Cancellation and Removal Provisions thus provide a method for voter suppressive groups to target historically disenfranchised voters and have them purged from the registration rolls and the early active voting list without any legal basis.

9. The Removal Provision separately requires anyone who receives an early ballot belonging to a former resident to write "Not at this address" on the ballot and place the ballot in the mail. *Id*. § 16-544(P). Assuming that the mail is successfully returned to the county recorder as undeliverable, the county recorder, upon receipt, would be required either to "contact the voter at the voter's new residence address in order to update that voter's address or to move the voter to inactive status," which means the voter would be removed from the active early voting list. *Id.* § 16-544(E). These requirements essentially force Arizona residents to provide leads to the county recorder for removing others from the active early voting list, without articulating any legal basis for doing so.

10. SB 1260 has no rational connection to any legitimate government purpose. It will not improve election integrity or prevent election fraud. Instead, it will severely chill voter registration and voter engagement efforts and disenfranchise eligible Arizona voters.

11. Each of the Challenged Provisions unduly burdens the right to vote in violation of the First and Fourteenth Amendments. They also infringe upon the right to due process under the Fourteenth Amendment.

12. The Felony Provision also separately violates the First and Fourteenth Amendments because it is unconstitutionally vague and overbroad.

13. The Cancellation and Removal Provisions also violate the Equal Protection Clause of the Fourteenth Amendment by disproportionately affecting voters who are more likely to move and have multiple voter registrations, such as young voters, college students, and other transient voters who are more likely to be poorer voters and non-white voters, and by allowing third parties to engage in targeted voter suppression of those groups.

14. SB 1260 is scheduled to go into effect on September 24, 2022. This Court should declare it invalid and enjoin its operation. No portion of SB 1260 is salvageable; each of its provisions is unconstitutional. *See State ex rel Napolitano v. Brown*, 194 Ariz. 340, 344 (1999) ("If the unconstitutional portions of the amendments are not severable from the remainder of the law, we must strike down the legislation as a whole.").

## JURISDICTION AND VENUE

15. Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the U.S. Constitution.

16. This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343, because the matters in controversy arise under the Constitution and laws of the United States.

17. This Court has personal jurisdiction over Defendants, who are domiciled in the State of Arizona and are sued only in their official capacities as Arizona's Secretary of State, Arizona's Attorney General, and each Arizona County Recorder.

18. Venue is proper in this district and division under 28 U.S.C. § 1391(b)(1) and LRCiv 5.1(a) because Defendants reside in Arizona. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that give rise to Plaintiffs' claims occurred in this judicial district and Defendants conduct business in this district in their official capacities.

19. This Court has the authority to enter a declaratory judgment and to provide injunctive relief under Rules 57 and 65 of the Federal Rules of Civil Procedure and pursuant to 28 U.S.C. §§ 2201 and 2202.

1

**PARTIES**

2      20. Plaintiff Arizona Alliance for Retired Americans, Inc. (the "Arizona Alliance")

3   is a nonprofit corporation organized under section 501(c)(4) of the Internal Revenue Code.

4   The Arizona Alliance's membership includes approximately 50,000 retirees from public

5   and private sector unions, community organizations, and individual activists in every county

6   in Arizona. The Arizona Alliance is a chartered affiliate of the Alliance for Retired

7   Americans. Its mission is to ensure social and economic justice and full civil rights that

8   retirees have earned after a lifetime of work. The Arizona Alliance accomplishes this

9   mission by actively pursuing and promoting legislation and public policies regarding critical

10  issues facing older Americans and working families. The Arizona Alliance also

11  accomplishes its mission by ensuring that its members are able to register to vote and

12  meaningfully participate in Arizona's elections through voter registration activities such as

13  encouraging voter registration at member meetings and phone banking drives.

14      21. The Challenged Provisions frustrate the Arizona Alliance's mission because they

15  make it more difficult for its members to register to vote and to receive and cast their ballots,

16  thus making it more difficult for the Arizona Alliance and its members to associate to

17  effectively further their shared political purposes. Because of SB 1260, the Arizona Alliance

18  will need to divert resources from other mission-critical work to spending time educating

19  its members and other voters about SB 1260 and how they can remain registered to vote

20  and remain on the correct active early voting list despite the Removal and Cancellation

21  Provisions. The Arizona Alliance will also need to educate its members and other voters on

22  the Removal Provision's requirement to affirmatively mark and return early ballots intended

23  for previous residents.

24      22. The Felony Provision will stifle the Arizona Alliance's ability to engage with its

25  members and constituents. Until a voter's prior registration is cancelled—a process that

26  could take months—the Arizona Alliance would need to refrain from registering that voter

27  or otherwise helping them to vote in order to ensure that its volunteers and employees would

28

not be subject to criminal liability. Even helping a voter update their address for their voter registration could risk felony prosecution under the Felony Provision if that voter remains registered in another state. The Felony Provision will make it more difficult for the Arizona Alliance to recruit employees and volunteers to carry out its mission because of the risk of criminal liability for engaging in its mission-achieving work. If the Arizona Alliance proceeds with voter engagement activities despite the risks of doing so under SB 1260, then its employees and volunteers will be required to divert resources from their typical activities to focus on identifying members and constituents who are registered to vote in more than one state or Arizona county. The Arizona Alliance will need to help those voters cancel their non-active registrations to ensure that their active registrations are not cancelled or they are not removed from the early active voting list. The Felony Provision will make it more costly and time-consuming for the Arizona Alliance to achieve its mission.

23.  The Arizona Alliance also brings this action on behalf of its members. Most of the Arizona Alliance's members are between 55 and 90 years of age and many have disabilities. Many of its members vote early by mail in large numbers, and many are members of the active early voting list. The Arizona Alliance also has many members that have moved from other states or counties where they were previously registered to vote, and who have not affirmatively canceled their previous voter registrations. The Arizona Alliance's members are at risk of having their registrations cancelled and being removed from the correct active early voting list as a result of SB 1260. They are also at risk of being found guilty of a felony for engaging in voter registration and mobilization activities as members of the Arizona Alliance.

24. Plaintiff Voto Latino is a nonprofit corporation organized under section 501(c)(4) of the Internal Revenue Code. Voto Latino is dedicated to growing political engagement in historically underrepresented communities, specifically young and Latinx voters. Voto Latino has made, and will continue to make, expenditures to educate, mobilize, and turn out voters in Arizona. Voto Latino employees and volunteers engage in voter

registration drives and conduct email and social media advertising campaigns to remind voters—particularly Voto Latino's core constituency, young and Latinx voters—to vote and to keep their voter registrations up to date. Voto Latino also conducts get-out-the-vote efforts, including text banking and advertising campaigns, to encourage voters to vote, remind them to update their voter registrations, and inform them about available means of voting, such as early in-person voting or voting by mail. Voto Latino frequently engages with college students and new residents of Arizona during its voter education and mobilization efforts. Because of SB 1260, Voto Latino will need to divert resources from other mission-critical work to spending time educating its constituents about SB 1260, the requirement to affirmatively mark and return early ballots intended for previous residents, and the need to check whether a voter has multiple voter registrations or active early voting list memberships.

25. The Felony Provision will stifle Voto Latino's ability to engage with its constituents. The Felony Provision will make it more difficult for Voto Latino to recruit employees and volunteers to carry out its mission because of the risk of criminal liability for providing assistance with voting. If Voto Latino proceeds with voter engagement activities despite the risks of doing so under SB 1260, then its employees and volunteers will be required to divert resources from their typical activities to focus on identifying members and constituents who are registered to vote in more than one state or Arizona county. Voto Latino anticipates that its constituents will be targeted by coordinated efforts by third parties to purge Latinx voters and students from Arizona's voter registration rolls and early voting lists, which SB 1260 permits with no notice to the affected voter. To combat this activity, Voto Latino will need to help its constituents cancel their non-active registrations. The Felony Provision will make it more costly and time-consuming for Voto Latino to achieve its mission.

26. Plaintiff Priorities USA ("Priorities") is a nonprofit corporation organized under section 501(c)(4) of the Internal Revenue Code. Priorities is a vote-centric progressive

advocacy and service organization. Its mission is to build a permanent infrastructure to engage Americans by persuading, registering, and mobilizing citizens around issues and elections that affect their lives. In furtherance of this purpose, Priorities works to help educate, mobilize, register, and turn out voters across the country. Priorities has made and will continue to make contributions and expenditures in the millions of dollars to educate, register, mobilize, and turn out voters in upcoming state and federal elections around the country. Priorities has committed to invest $8.4 million in voter engagement efforts in Arizona for the 2022 election cycle. In anticipation of the upcoming Arizona state and federal elections, Priorities has already spent over $4.8 million on advertising and voter education, including efforts targeted at voters who have recently moved.

27. SB 1260 directly harms Priorities by frustrating its mission and its efforts to educate, register, and turn out Arizona voters. Priorities is aware of SB 1260 and is planning to expend and divert additional funds and resources in voter education efforts, as well as registration, mobilization, and turnout activities, particularly through advertisements, in Arizona at the expense of its other efforts in order to combat the effects of SB 1260 on individuals who have multiple voter registrations or who assist individuals who have multiple voter registrations that have not been affirmatively cancelled. Priorities is concerned that many of the Arizona voter engagement organizations it funds will be deterred from engaging in robust operations because of the Felony Provision, making it more difficult for Priorities to achieve its mission.

28. Defendant Katie Hobbs is the Secretary of State for the State of Arizona and is named as a Defendant in her official capacity. In her official capacity, she is the chief state election officer and is responsible for overseeing the voting process in Arizona and is empowered with broad authority to carry out that responsibility. She is also responsible for proscribing rules for, among other things, early voting, which are set forth in the Arizona Election Procedures Manual. A.R.S. § 16-452.

29. Defendant Mark Brnovich is the Attorney General for the State of Arizona and is named as a Defendant in his official capacity. In his official capacity, he serves as the Chief Legal Officer of the State of Arizona and is responsible for prosecuting offenses under Title 16 ("Elections and Electors") of the Arizona Revised Statutes, which includes all of the provisions of SB 1260. A.R.S. § 16-1021. He is also responsible for enforcing criminal laws, such as the Felony Provision, by presenting evidence to the state grand jury and prosecuting all indictments. *Id.* §§ 21-424; 21-427(B).

30. Defendant Larry Noble is the Apache County Recorder and is named as a Defendant in his official capacity only. As County Recorder, he is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id*. §§ 16-165, 16-544.

31. Defendant David Stevens is the Cochise County Recorder and is named as a Defendant in his official capacity only. As County Recorder, he is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

32. Defendant Patty Hansen is the Coconino County Recorder and is named as a Defendant in her official capacity only. As County Recorder, she is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

33. Defendant Sadie Jo Bingham is the Gila County Recorder and is named as a Defendant in her official capacity only. As County Recorder, she is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

34. Defendant Wendy John is the Graham County Recorder and is named as a Defendant in her official capacity only. As County Recorder, she is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

35. Defendant Sharie Milheiro is the Greenlee County Recorder and is named as a Defendant in her official capacity only. As County Recorder, she is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

36. Defendant Richard Garcia is the La Paz County Recorder and is named as a Defendant in his official capacity only. As County Recorder, he is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

37. Defendant Stephen Richer is the Maricopa County Recorder and is named as a Defendant in his official capacity only. As County Recorder, he is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

38. Defendant Kristi Blair is the Mohave County Recorder and is named as a Defendant in her official capacity only. As County Recorder, she is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

39. Defendant Michael Sample is the Navajo County Recorder and is named as a Defendant in his official capacity only. As County Recorder, he is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

40. Defendant Gabriella Cázares-Kelly is the Pima County Recorder and is named as a Defendant in her official capacity only. As County Recorder, she is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

41. Defendant Dana Lewis is the Pinal County Recorder and is named as a Defendant in her official capacity only. As County Recorder, she is responsible for processing and

maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

42. Defendant Suzanne Sainz is the Santa Cruz County Recorder and is named as a Defendant in her official capacity only. As County Recorder, she is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

43. Defendant Leslie Hoffman is the Yavapai County Recorder and is named as a Defendant in her official capacity only. As County Recorder, she is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

44. Defendant Robyn Pouquette is the Yuma County Recorder and is named as a Defendant in her official capacity only. As County Recorder, she is responsible for processing and maintaining voter registration records, including cancelling voter registrations and maintaining the active early voting list. *Id.*

## STATEMENT OF FACTS AND LAW

45. In 2021, Arizona was among the fastest-growing states in population growth, fueled by domestic migration: over 93,000 people relocated to Arizona from elsewhere within the United States. From July 2020 to July 2021, Maricopa County was the fastest-growing county in the country, with a population growth of over 58,000 people. Between 2010 and 2019, the population of individuals who are 65 years of age and older in Arizona increased by nearly 50%.

46. Early voting is very popular among Arizona voters. Because Arizona has no-excuse early voting, any registered voter, including new residents of Arizona, can vote early in any election. A.R.S. § 16-541. In addition, any Arizona voter may request to join the active early voting list. All voters who are added to the active early voting list will receive an early ballot by mail "automatically for any election" for which they are eligible to vote. *Id.* § 16-544(A), (H).

47. Over the past decade, early voting in Arizona has grown at a consistent and rapid rate. In the 2008 general election, for example, just over a million Arizona voters voted early. By the 2016 general election, that number had doubled to over two million voters. In 2018, a lower-turnout midterm election, around 1.9 million voters voted early. In 2020, around 2.4 million voters voted early. In the most recent election, over 1.2 million voters voted early in the 2022 gubernatorial primary.

48. SB 1260 targets voters who are registered to vote in more than one place even though having multiple registrations is legal and common, particularly among voters who have moved their residence. SB 1260 threatens these voters with severe harm—including disenfranchisement—because it requires county recorders to cancel a voter's registration and remove them from Arizona's active early voting list solely because they are registered to vote in another place and have not affirmatively cancelled their registration. There is no requirement that the county recorder give the voter *any* notice of the cancellation, or an opportunity to avoid or contest it, much less that the recorder do so in accordance with federal law. As a result, many voters will suffer disenfranchisement because they will think that they are registered to vote and expect that they will be sent an early ballot by mail, only to learn that their county recorder made changes to their registration status *after* the deadline to register had already passed.

49. SB 1260 will have severe detrimental effects on Plaintiffs' ability to effectively engage with their members and constituents and assist them in exercising their right to vote. Each Challenged Provision of SB 1260 is discussed, in turn, below.

**A.      Felony Provision (A.R.S. § 16-1016(12))**

50. SB 1260 amends A.R.S. § 16-1016 to add subsection (12) (the "Felony Provision"), which states that a person is guilty of a class 5 felony who:

> Knowingly provides a mechanism for voting to another person who is registered in another state, including by forwarding an early ballot addressed to the other person.

51. A class 5 felony conviction in Arizona carries a penalty ranging from six months to two years and six months' imprisonment. A.R.S. § 13-702(D). A conviction for a felony suspends the right to vote in Arizona. *Id*. § 13-904.

52. The Felony Provision does not define the operative phrase—providing a "mechanism for voting"—except to specify that the phrase should be interpreted broadly enough to include activity as diminutive as "forwarding an early ballot addressed to another person." *Id*. § 16-1016. The possibilities of prohibited activities are thus nearly limitless, ranging from registering a person to vote, to helping a person update their address for purposes of voting, to merely providing them with information on how to sign up for the active early voting list or cast their ballot. In fact, even *helping a person cancel their other voter registrations* could be considered providing them with a "mechanism for voting" under SB 1260, meaning that not only would Plaintiffs be prohibited from helping voters register to vote because of SB 1260, but they would also be prohibited from helping them to remain registered to vote in compliance with SB 1260 by cancelling other registrations.

53. The Felony Provision also does not describe the "knowingly" *mens rea* requirement in any detail. From the plain text, a person could be guilty of a class 5 felony if they "[k]nowingly" "provide[] a mechanism for voting" regardless of whether they know that the specific person they are helping is registered in another state, and regardless of whether the person actually intends to vote in two states.

54. Though voting in more than one state is illegal, it is perfectly legal to be registered to vote in more than one state or in more than one county in Arizona. In fact, it is quite common.

55. The Felony Provision will severely chill Plaintiffs' voter registration and mobilization efforts in Arizona by making it a crime to "knowingly" provide "a mechanism for voting" to a voter who is registered to vote in another state. The ambiguity in the plain language of the Felony Provision only adds to the burden on Plaintiffs and makes it more likely that they will be deterred from engaging in voter registration and mobilization efforts.

It is unclear, for example, which of Plaintiffs' voter registration or mobilization activities would constitute "a mechanism for voting."

56. A large part of Plaintiffs' voter registration and mobilization activities includes registering and engaging with voters who have moved to Arizona from other states, making it inevitable that some number among them have prior voter registrations in other states or counties. If Plaintiffs' employees or volunteers register or otherwise assist an individual who has not taken the affirmative step of successfully canceling their previous voter registration(s), they could face criminal penalties under the plain language of the Felony Provision.

57. The Felony Provision—especially its vagueness and overbreadth—imposes a severe burden on Plaintiffs' voter registration and mobilization efforts in Arizona because it apparently imposes felony charges on volunteers and staff for simply helping to register or mobilize voters who may not have affirmatively cancelled other voting registrations—in other words, for being civically engaged or doing their jobs. And it requires organizations such as Plaintiffs to either confirm that each person they reach out to is not registered to vote in any other states, or to ensure that each person has successfully canceled any registration in another state before providing any further assistance. As a result, Plaintiffs' voter registration and mobilization activities will be severely hindered, and new Arizona residents will have less support in registering to vote and voting.

**B.     Cancellation Provision (A.R.S. § 16-165(A)(10), (B)) and Removal Provision (A.R.S. § 16-544(P)–(R))**

58. Through the Cancellation and Removal Provisions, SB 1260 imposes severe burdens on voters who move within the state.

59. SB 1260 amends A.R.S. § 16-165 to add subsections (A)(10) and (B) (the "Cancellation Provision"), which state that a county recorder "shall" cancel a registration in the following two circumstances:

> 1. When the county recorder receives confirmation from another county recorder that the person registered has registered

to vote in that other county.

2. If the county recorder receives credible information that a person has registered to vote in a different county, the county recorder shall confirm the person's voter registration with that other county and, on confirmation, shall cancel the person's registration pursuant to subsection A, paragraph 10 of this section.

60. SB 1260 also amends A.R.S. § 16-544 to add subsections (P), (Q), and (R) (the "Removal Provision"), which state:

P. A person who receives an early ballot at an address at which another person formerly resided, without voting the ballot or signing the envelope, shall write "Not at this address" on the envelope and place the mail piece in a United States Postal Service collection box or other mail receptacle. On receipt the county recorder or other officer in charge of elections shall proceed in the manner prescribed in subsection E of this section.

Q. When the county recorder receives confirmation from another county that a person registered has registered to vote in that other county, the county recorder shall remove that person from the active early voting list.

R. If the county recorder receives credible information that a person has registered to vote in a different county, the county recorder shall confirm the person's voter registration with that other county and, on confirmation, shall remove that person from the county's active early voting list pursuant to subsection Q of this section.

61. The Cancellation and Removal Provisions require a county recorder to cancel an otherwise valid and active voter registration or remove an otherwise eligible voter from the active early voting list merely because "the person registered has registered to vote in that other county." A.R.S. § 16-165(A)(10); *Id.* § 16-544(Q). SB 1260 contains no further explanation of *which* county recorder "shall cancel" the person's registration or *which* county recorder "shall remove" the person from the active early voting list. *Id.* § 16-165(A)(10), (B); *Id.* § 16-544(Q), (R). Even if a person now resides in, is eligible to vote in, and intends to vote in a particular county, the Cancellation and Removal Provisions

1   appear to require the county recorder *of that county* to cancel the person's voter registration

2   or remove that person from the active early voting list if the person is registered in another

3   county.

4       62. The Cancellation and Removal Provisions compel county recorders to cancel

5   registrations and remove voters from the active early voting list without any requirement to

6   provide notice to the affected voters and regardless of whether the affected voters consent

7   to such action. *Id*. § 16-165(A)(10), (B); *Id.* § 16-544(Q), (R). Similarly, there is no

8   requirement for the county recorder to contact the voter to determine which voter

9   registration should remain active. Without any notice, individual Arizona voters will have

10  no knowledge as to whether any of their voter registrations are active, or which ones remain

11  active, or whether they remain on any active early voting list.

12      63. The Cancellation and Removal Provisions do not contain any mechanism for the

13  county recorders to coordinate their cancellations or removals, resulting in a scenario for

14  voter disenfranchisement in which two county recorders might *each* cancel a voter's

15  registration (or remove the voter from the active early voting list) in their respective

16  counties upon receiving confirmation from each other that the voter has registered in both

17  counties. This double cancellation could result in a person being suddenly stripped of any

18  active voter registration and being removed from all active early voting lists, without any

19  notice whatsoever. And even if a voter's registrations are not all cancelled, nothing in the

20  Cancellation Provision prevents the cancellation of the voter's registration where the voter

21  currently resides, is eligible and intends to vote—a scenario that could also lead to

22  disenfranchisement without notice. The Removal Provision similarly fails to protect against

23  this situation; a voter could be removed, without notice, from the active early voting list in

24  the county in which they intend to vote.

25      64. The Cancellation and Removal Provisions also allow third parties to provide

26  county recorders with "credible information that a person has registered to vote in a

27  different county." *Id*. §§ 16-165(B), 16-544(R). Upon receiving such information, a county

28

recorder is required—again, regardless of whether the affected voter consents or is even notified—to "confirm the person's voter registration with that other county" and, upon confirmation, to cancel the person's registration or remove the person from the active early voting list. *Id*. § 16-165(B); *id*. § 16-544(Q).

65. SB 1260 contains no explanation of what constitutes "credible information," who may provide it, or whether a county recorder has any duty to investigate.

66. The Cancellation and Removal Provisions will enable targeted voter suppression by allowing third parties to provide "credible information" about certain populations who may have moved. For example, a third party could contact the county recorder for the county where each university in Arizona is located and notify them of any students who have "registered to vote in a different county." *Id*. § 16-165(B); *see also id*. § 16-544(Q). Under the Cancellation and Removal Provisions, the county recorder would then be required to confirm with another county recorder whether these students have registered in a different county and, upon confirmation, cancel the students' voter registrations and remove the students from the active early voting list. There is no requirement to notify or receive permission from the students prior to canceling their voter registrations or removing them from the active early voting list.

67. The Removal Provision separately requires a person who receives an early ballot belonging to a former resident to write "Not at this address" on the ballot and place the ballot in the mail. *Id*. § 16-544(P). Assuming that the mail is successfully returned to the county recorder as undeliverable, the county recorder, upon receipt, would be required either to "contact the voter at the voter's new residence address in order to update that voter's address or to move the voter to inactive status," meaning the voter would be removed from the active early voting list. *Id*. § 16-544(E).

68. Though SB 1260 does not provide for specific penalties for the failure to comply with A.R.S. § 16-544(P), the mandatory language of the provision would create an

affirmative legal duty for Arizona residents to monitor their mail and mark and return any early ballots meant for former residents.

69. In other words, an Arizona resident who receives an early ballot meant for a former resident and who simply ignores the early ballot (without marking it or placing it back in the mail) would be in violation of Arizona law under subsection (P). Subsection (P) effectively conscripts Arizona residents into helping the state purge their neighbors from the voter rolls.

**C.    Severability**

70. Given that multiple interrelated parts of SB 1260 would violate federal law and the U.S. Constitution in a myriad of ways, no single portion of SB 1260 is salvageable and each of its provisions must be struck down to preserve the voting rights of Arizona voters. *See Brown*, 194 Ariz. at 344 (holding that portions of a statute are severable only if "the valid parts are effective and enforceable standing alone and independent of those portions declared unconstitutional and if the valid and invalid portions are not so intimately connected as to raise the presumption the legislature would not have enacted one without the other, and the invalid portion was not the inducement of the act" (cleaned up)).

**CLAIMS FOR RELIEF**

**COUNT I**
**Free Speech and Association**
**U.S. Const. amends. I, XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202**
**(Felony Provision is Unconstitutionally Vague and Overbroad)**

71. Plaintiffs incorporate by reference the allegations in Paragraphs 1–70 as though fully set forth herein.

72. The Felony Provision is unconstitutionally overbroad and vague under the First and Fourteenth Amendments. It does not define its operative phrase—providing a "mechanism for voting"—except to specify that the phrase should be interpreted broadly enough to include activity as diminutive as "forwarding an early ballot addressed to another person." The possibilities of prohibited activities are thus nearly limitless, ranging from

registering a person to vote, to helping a person update their address for purposes of voting or registering to vote, to merely providing them with information on how to sign up for the active early voting list or cast their ballot.

73. The Felony Provision also does not describe the "knowingly" *mens rea* requirement in any detail. From the plain text, a person could be guilty of a class 5 felony if they "[k]nowingly" "provide[] a mechanism for voting," regardless of whether they know that the person they are helping is registered in another state, and regardless of whether the person actually intends to vote in two states.

74. A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022) (quotation marks omitted). Vague statutes are especially egregious when they "abut upon sensitive areas of basic First Amendment freedoms." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

75. The Felony Provision lacks clarity about what activities are prohibited or what activities could be deemed to provide a "mechanism for voting." Nor does it explain clearly what is meant by "knowingly provides a mechanism for voting." Thus, it fails to provide "fair notice of what is prohibited" and is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Butcher*, 38 F.4th at 1169 (quotation omitted).

76. Because Plaintiffs do not know which activities are permitted or prohibited under the Felony Provision, and because they do not know what level of knowledge is required to constitute a violation, their voter registration efforts and other voter engagement efforts will be hindered. *See, e.g.*, *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (noting that even the threat of civil penalties "is likely to have a chilling effect on the entirety of [a voter registration] drive, including its communicative aspects"). These activities are core political speech. *Cf. Meyer v. Grant*, 486 U.S. 414, 421–22 (1988) (describing circulating a petition as "the type of interactive communication concerning

political change that is appropriately described as 'core political speech'" and is protected by the First Amendment).

77. A law is unconstitutionally overbroad when it makes conduct punishable that under some circumstances is constitutionally protected activity. "[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612–615 (1973)).

78. Plaintiffs' efforts to help voters register and cast their ballots, as well as the accompanying conversations and interactions between Plaintiffs' representatives or volunteers and voters surrounding voting, are core political speech. *Cf. Meyer*, 486 U.S. at 421–22.

79. The Felony Provision is thus unconstitutionally vague and overbroad as it criminalizes any activity that provides a "mechanism for voting," without limitation, chilling Plaintiffs' efforts to register and mobilize voters and ensure that their voter registration information is up to date.

80. The Felony Provision is therefore unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution.

## COUNT II
### Procedural Due Process
### U.S. Const. amend. XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202
### (Felony Provision)

81. Plaintiffs incorporate by reference the allegations in Paragraphs 1–80 as though fully set forth herein.

82. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Supreme Court has long recognized that laws must give "the person of ordinary

intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "must provide explicit standards for those who apply them." *Id.*

83. To determine whether a plaintiff has been denied procedural due process in violation of the Due Process Clause of the Fourteenth Amendment, a court first asks whether a constitutionally protected liberty interest is at stake. If so, the court then determines whether the procedural protections provided are sufficient by examining, "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

84. Plaintiffs and other Arizonans have liberty interests in not facing criminal penalties, including imprisonment, and in being able to exercise the right to vote. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (noting that "the most elemental of liberty interests" is "the interest in being free from physical detention by one's own government"); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1357 (D. Ariz. 1990) ("Because voting is a fundamental right, the right to vote is a 'liberty' interest which may not be confiscated without due process.").

85. By changing the law to make it a felony for anyone to knowingly provide voting assistance to eligible Arizona voters who have voter registrations in other states that have not been affirmatively cancelled, Defendants have deprived eligible Arizona voters, without due process, of their liberty interests in remaining free from prison and retaining their ability to vote.

86. Absent relief, Plaintiffs, along with the Arizona Alliance's members, will be denied due process.

## COUNT III
**Undue Burden on the Right to Vote**
**U.S. Const. amends. I, XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202**
**(Felony Provision)**

87. Plaintiffs incorporate by reference the allegations in Paragraphs 1–86 as though fully set forth herein.

88. The Felony Provision will chill voter registration and mobilization efforts in Arizona because it makes it more costly and risky for organizations and individuals to undertake such activities. Some organizations may choose to cease such efforts altogether because of the risk of criminal penalties associated with providing assistance to a voter who registered to vote in another state and has not cancelled that registration.

89. The Felony Provision severely burdens the right to vote because the numerous voters who benefit from third party registration and mobilization efforts will have no opportunity or less opportunity to take advantage of such efforts. In addition, the Felony Provision burdens voters who wish to obtain assistance from third-party organizations engaged in registration and mobilization efforts because it requires voters to affirmatively and successfully cancel all other voter registrations before receiving assistance from any third party in either registering to vote, updating their voter registration information, or casting their ballot.

90. In the Ninth Circuit, a court considering a challenge to a state election law must carefully weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1187 (9th Cir. 2021) (cleaned up).

91. This balancing test uses a flexible sliding scale, where the rigorousness of scrutiny depends upon the extent to which the challenged law burdens voting rights. A law that imposes a "severe" burden is met with strict scrutiny. *Id.*

92. The Felony Provision will severely chill voter registration and mobilization activities in Arizona and consequently reduce Arizonans' ability to receive assistance in registering to vote, updating their voter registration information, or casting their ballot. Meanwhile, the Felony Provision is not necessary or justified by any legitimate state interest. A person's voter registration in another state is not related to whether that person is eligible to vote in Arizona.

93. The Felony Provision violates the First and Fourteenth Amendments by severely burdening the right to vote without justification by any legitimate state interest.

## COUNT IV
### Undue Burden on the Right to Vote
### U.S. Const. amends. I, XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202
### (Cancellation and Removal Provisions)

94. Plaintiffs incorporate by reference the allegations in Paragraphs 1–93 as though fully set forth herein.

95. In the Ninth Circuit, a court considering a challenge to a state election law must carefully weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Hobbs*, 18 F.4th at 1187 (cleaned up).

96. This balancing test uses a flexible sliding scale, where the rigorousness of scrutiny depends upon the extent to which the challenged law burdens voting rights. A law that imposes a "severe" burden is met with strict scrutiny. *Id.*

97. The Cancellation and Removal Provisions severely burden the right to vote because they require voters to affirmatively and successfully cancel voter registrations in

all Arizona counties—except for the one in which they intend to vote—in order to avoid the ultimate injury in the voting context: potential disenfranchisement because their registration has been cancelled or they have been removed from the active early voting list without notice.

98. Neither of these provisions has any reasonable relation to a legitimate state interest. A person's voter registration in another county is not related to whether that person is eligible to vote in Arizona.

99. Nor are the Cancellation or Removal Provisions necessary to prevent election fraud: people can commit election fraud without having multiple voter registrations, and having multiple voter registrations does not mean a person is committing election fraud. The same rationale applies for people on the active early voting list.

100. The Cancellation and Removal Provisions violate the First and Fourteenth Amendments by severely burdening the right to vote without any legitimate state interest.

**<u>COUNT V</u>**
**Procedural Due Process**
**U.S. Const. amend. XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202**
**(Cancellation and Removal Provisions)**

101. Plaintiffs incorporate by reference the allegations in Paragraphs 1–100 as though fully set forth herein.

102. The Cancellation and Removal Provisions compel county recorders to cancel registrations and remove voters from the active early voting list without any requirement to provide notice to the affected voters and regardless of whether the affected voters consent to such action. A.R.S. § 16-165(A)(10), (B); *id.* § 16-544(Q), (R). Similarly, there is no requirement for the county recorder to contact the voter to determine which voter registration should remain active.

103. "Because voting is a fundamental right, the right to vote is a 'liberty' interest which may not be confiscated without due process." *Raetzel*, 762 F. Supp. at 1357.

104. In the Ninth Circuit, a court considering a challenge to a state election law must carefully weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Hobbs*, 18 F.4th at 1187 (cleaned up).

105. This balancing test uses a flexible sliding scale, where the rigorousness of scrutiny depends upon the extent to which the challenged law burdens voting rights. A law that imposes a "severe" burden is met with strict scrutiny. *Id.*

106. The Cancellation and Removal Provisions violate due process because they severely burden the right to vote and could result in disenfranchisement by requiring the cancellation of a voter's registration and the removal of a voter from the early active voting list without notice to the voter or the opportunity to contest such action.

107. The Cancellation and Removal Provisions do not contain any mechanism for the county recorders to coordinate their cancellations or removals, such that two county recorders might *each* cancel a voter's registration (or remove the voter from the active early voting list) in their respective counties upon receiving confirmation from each other that the voter has registered in both counties. This double cancellation could result in a person being suddenly stripped of any active voter registration and being removed from all active early voting lists, without any notice whatsoever.

108. And even if a voter's registrations are not all cancelled, nothing in the Cancellation Provision prevents the cancellation of the registration where the voter currently resides, is eligible and intends to vote—a scenario that could also lead to disenfranchisement without notice. The Removal Provision similarly fails to protect against this situation; a voter could be removed, without notice, from the active early voting list in the county in which they intend to vote.

109. The Cancellation and Removal Provisions do not have any reasonable relation to a legitimate state interest. A person's voter registration in another county is not related to whether that person is eligible to vote in Arizona. There is no reason why county recorders cannot provide notice or obtain consent before cancelling a registration or removing a voter from the early active voting list.

110. Nor are the Cancellation or Removal Provisions necessary to prevent election fraud: a person can commit election fraud without having multiple voter registrations, and having multiple voter registrations does not mean a person is committing election fraud. The same rationale applies for people on the active early voting list.

111. Absent relief, Plaintiffs, along with the Arizona Alliance's members, will be denied due process.

### COUNT VI
**Equal Protection**
**U.S. Const. amend. XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202**
**(Cancellation and Removal Provisions)**

112. Plaintiffs incorporate by reference the allegations in Paragraphs 1–111 as though fully set forth herein.

113. "The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees each and every person that they will not be denied their fundamental rights—including the right to vote—in an arbitrary or discriminatory manner." *Charfauros v. Bd. of Elections*, 249 F.3d 941, 951 (9th Cir. 2001). "[I]f a challenged statute grants the right to vote to some citizens and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest." *Id.* (cleaned up).

114. Both the Cancellation and Removal Provisions place a duty on voters to affirmatively cancel their other voter registrations, which would disproportionately burden voters who are more likely to have multiple voter registrations, such as young voters, college students, older voters—many of whom move to Arizona when they reach retirement

age—and other transient voters who are more likely to be poorer voters and non-white voters.

115. These same voters are more likely to register to vote in multiple states or counties and are thus more likely to have their voter registrations canceled pursuant to the Cancellation Provision and to be removed from the active early voting list pursuant to the Removal Provision, without any notice or opportunity to take corrective action to maintain their ability to vote.

116. The Cancellation and Removal Provisions will enable targeted voter suppression by allowing third parties to provide county recorders with "credible information" about people that have voter registrations in multiple counties, which would then compel county recorders to confirm that information and, once confirmed, cancel the affected voter registrations and remove affected voters from the active early voting list. As discussed, SB 1260 makes it easier for voter suppressive groups to systematically target groups that are more likely to move, register to vote in multiple counties, or rely on the active early voting list, such as young voters, college students, older voters, and other transient voters who are more likely to be nonwhite and poorer voters.

117. The Cancellation and Removal Provisions amount to an "arbitrary or discriminatory" denial of the fundamental right to vote. *Charfauros*, 249 F.3d at 951.

118. The Cancellation and Removal Provisions are not "necessary to promote a compelling state interest," as is required if the provisions grant the right to vote to some citizens but deny it to others. *Id.* (cleaned up). Having multiple voter registrations is legal in Arizona and does not relate in any way to a person's eligibility to vote.

119. Nor are the Cancellation or Removal Provisions necessary to prevent election fraud: a person can commit election fraud without having multiple voter registrations, and having multiple voter registrations does not mean a person is committing election fraud. The same rationale applies for people on the active early voting list.

1

**PRAYER FOR RELIEF**

2  **WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

3         a.     Declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that

4                  Defendants have violated the First and Fourteenth Amendments through the

5                  Challenged Provisions of SB 1260;

6         b.     Permanently enjoining Defendants, their respective agents, officers,

7                  employees, and successors, and all persons acting in concert with each or any

8                  of them, from enforcing SB 1260;

9         c.     Awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees

10                incurred in bringing this action under 42 U.S.C. § 1988 and other applicable

11                laws; and

12         d.     Granting such other and further relief as the Court deems just and proper.

13

14  Dated: August 15, 2022               Respectfully submitted,

15                                   */s/ Daniel A. Arellano*

16                                  Roy Herrera (No. 032901)
                                       Daniel A. Arellano (No. 032304)

17                                  **HERRERA ARELLANO LLP**
                                       530 East McDowell Road, Suite 107-150

18                                  Phoenix, Arizona 85004-1500

19                                  Aria C. Branch*
                                         Daniel J. Cohen*

20                                  Joel Ramirez*
                                      **ELIAS LAW GROUP LLP**

21                                  10 G Street NE, Suite 600
                                       Washington, D.C. 20002

22                                  * *Pro Hac Vice* Application Forthcoming

23                                  *Counsel for Plaintiffs*

24

25

26

27

28