Roy Herrera (No. 032901)
Daniel A. Arellano (No. 032304)
**HERRERA ARELLANO LLP**
530 East McDowell Road, Suite 107-150
Phoenix, Arizona 85004-1500
Telephone: (602) 567-4820
roy@ha-firm.com
daniel@ha-firm.com

Aria C. Branch*
Daniel J. Cohen*
Joel Ramirez*
Tina Meng*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
abranch@elias.law
dcohen@elias.law
jramirez@elias.law
tmeng@elias.law

* *Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Alliance for Retired Americans, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Katie Hobbs, in her official capacity as Secretary of State for the State of Arizona, et al.,<br><br>Defendants. | **No. CV-22-1374-GMS**<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS


INTRODUCTION ........ 1

ARGUMENT ........ 3

I. Plaintiffs' claims are justiciable. ........ 3

A. Plaintiffs' claims as to the Felony Provision are ripe. ........ 3

B. Plaintiffs have standing to challenge the Cancellation and Removal Provisions. ........ 6

1. The Cancellation and Removal Provisions do not, and cannot, codify existing practice. ........ 7

2. The Cancellation and Removal Provisions cause Plaintiffs cognizable injury. ........ 10

3. An injunction of SB 1260 will remedy Plaintiffs' injuries. ........ 11

II. Plaintiffs have demonstrated a likelihood of success on the merits. ........ 13

A. The Felony Provision violates the Constitution. ........ 13

1. The Felony Provision is Unconstitutionally Vague. ........ 13

2. The Felony Provision is Overbroad. ........ 19

B. The Cancellation and Removal Provisions fail to provide notice to voters prior to cancellation of their voter registration, as required under the NVRA and Due Process Clause. ........ 21

1. The Cancellation Provision violates and is preempted by the NVRA. ... 21

2. The Cancellation and Removal Provisions Violate Procedural Due Process. ........ 24

III. Plaintiffs will suffer irreparable injury. ........ 28

IV. Plaintiffs did not unduly delay in seeking relief. ........ 29

CONCLUSION ........ 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AK Futures LLC v. Boyd Street Distro, LLC*,
35 F.4th 682 (9th Cir. 2022) .......... 13

*Am. C.L. Union of Nev. v. Heller*,
378 F.3d 979 (9th Cir. 2004) .......... 16

*Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*,
138 S. Ct. 1865 (2018) .......... 29

*Arizonans for Fair Elections v. Hobbs*,
454 F. Supp. 3d 910 (D. Ariz. 2020) .......... 12

*Brnovich v. Hobbs*,
No. P1300cv202200269 (Ariz. Super. Ct. Apr. 21, 2022) .......... 12

*Burbank–Glendale–Pasadena Airport Auth. v. City of Burbank*,
136 F.3d 1360 (9th Cir. 1998) .......... 11

*Cal. Pro-Life Council, Inc. v. Getman*,
328 F.3d 1088 (9th Cir. 2003) .......... 4

*Cheneau v. Garland*,
997 F.3d 916 (9th Cir. 2021) .......... 17

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) .......... 15, 18

*City of Chicago v. Morales*,
527 U.S. 41 (1999) .......... 13, 19

*Common Cause Ind. v. Lawson*,
937 F.3d 944 (7th Cir. 2019) .......... 23, 26

*E. Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) .......... 4

*Fair Fight v. True the Vote*,
No. 20-cv.0302-SCJ (N.D. Ga. May 16, 2022) .......... 10

*Feldman v. Ariz. Sec'y of State's Off.*,
843 F.3d 366 (9th Cir. 2016) .......... 20

*Forbes v. Napolitano*,
236 F.3d 1009 (9th Cir. 2000) .......... 19

*Foti v. City of Menlo Park*,
146 F.3d 629 (9th Cir. 1998) .......... 13

*Freytag v. Comm'r*,
501 U.S. 868 (1991) .......... 18

*Glazer v. State*,
244 Ariz. 612 (2018) .......... 6

*I.L. v. Alabama*,
739 F.3d 1273 (11th Cir. 2014) .......... 12

*Johnson v. United States*,
576 U.S. 591 (2015) .......... 19

*Knox v. Brnovich*,
907 F.3d 1167 (9th Cir. 2018) .......... 20

*League of Women Voters of Fla. v. Browning*,
863 F. Supp.2d 1155 (N.D. Fla. 2012) .......... 20

*League of Women Voters v. Hargett*,
400 F. Supp. 3d 706 (M.D. Tenn. 2019) .......... 20

*League of Women Voters v. Sullivan*,
5 F.4th 714 (7th Cir. 2021) .......... 22

*Lehman Bros. v. Schein*,
416 U.S. 386 (1974) .......... 16

*Lopez v. Candaele*,
630 F.3d 775 (9th Cir. 2010) .......... 4, 5

*LSO, Ltd. v. Stroh*,
205 F.3d 1146 (9th Cir. 2000) .......... 5

*Meyer v. Grant*,
486 U.S. 414 (1988) .......... 19, 20

*Micomonaco v. Washington*,
45 F.3d 316 (9th Cir. 1995) .......... 16

*Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*,
457 F.3d 941 (9th Cir. 2006) .......... 12

*Protectmarriage.com-Yes on 8 v. Bowen*,
752 F.3d 827 (9th Cir. 2014) .......... 5, 6, 21

*Raetzel v. Parks/Bellemont Absentee Election Bd.*,
762 F. Supp. 1354 (D. Ariz. 1990) .......... 25

*Renne v. GearRenne v. Gear*,
501 U.S. 312 (1991) .......... 12

*Riordan v. State Farm Mut. Auto. Ins. Co.*,
589 F.3d 999 (9th Cir. 2009) .......... 16

*Ruiz v. Hull*,
191 Ariz. 441 (1998) .......... 29

*Smith v. Goguen*,
415 U.S. 566 (1974) .......... 13

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) .......... 4, 5

*Tingley v. Ferguson*,
— F.4th —, No. 21-35815, 2022 WL 4076121 (9th Cir. Sept. 6, 2022) .......... 6

*United States v. Stevens*,
559 U.S. 460 (2010) .......... 28

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) .......... 6

*Virginia v. Am. Booksellers Ass'n, Inc.*,
484 U.S. 383 (1988) .......... 16

*WildEarth Guardians v. U.S. Dep't of Agric.*,
795 F.3d 1148 (9th Cir. 2015) .......... 12

**Statutes**

A.R.S. § 16-016(12) .......... 18

A.R.S. § 16-125 .......... 26

A.R.S. § 16-165 .......... *passim*

A.R.S. § 16-544 ........ *passim*

A.R.S. § 16-655 ........ 9

A.R.S. § 16-1016 ........ 1, 14, 17, 18

52 U.S.C. § 20501 ........ 22, 23

52 U.S.C. § 20507 ........ 22, 23, 25

52 U.S.C. § 20510(b) ........ 23

**Other Authorities**

Ariz. Sec’y of State, 2014 EPM (June 2014), https://azsos.gov/sites/default/files/election_procedure_manual_2014.pdf ........ 8

Ariz. Sec'y of State, 2019 EPM (Dec. 2019), https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf ........ 8, 9, 24

Ariz. Sec’y of State, 2022 General Election, https://apps.arizona.vote/electioninfo/elections/2022-general-election/state/2522/33/0 ........ 28

Fed. R. Civ. P. 24 ........ 16

**INTRODUCTION**

SB 1260's text is short, but it introduces an impressive plethora of constitutional infirmities. The Felony Provision is the worst offender, creating a new class 5 felony—with a minimum imprisonment term of six months—for anyone who "knowingly provides a mechanism for voting to another person who is registered in another state." A.R.S. § 16-1016(12).[1] Plaintiffs are organizations heavily invested in voter registration and mobilization efforts in Arizona and are rightly concerned that under the plain language of the Felony Provision, they, their members, and volunteers put themselves at significant risk of criminal prosecution for simply engaging in the voter education and assistance that they regularly engage in. That activity, moreover, consists of core political speech and associational activity protected by the First Amendment, the freedom of which is critical to a functioning democracy. And the Cancellation and Removal Provisions directly threaten the right to vote of lawful Arizona voters, including among Plaintiffs' membership and constituencies, requiring county officials to remove lawful voters from the rolls and Active Early Voting List ("AEVL") without notice, confirmation, or consent. *Id.* § 16-165(A)(10), (B); *id.* § 16-544(Q), (R).

The responses filed by the Attorney General, Proposed Intervenor Yuma County Republican Committee ("YCRC"), and the Secretary of State are contradictory (in the case of the former two, even sometimes within the same brief), and, at times, downright nonsensical. On the one hand, the Attorney General and YCRC claim that SB 1260 is merely codifying existing practice, so Plaintiffs are not injured by it. On the other hand, they assert that SB 1260 is necessary to resolve a loophole which enables voter fraud. At some points they say SB 1260 must be read narrowly to cure its impermissible vagueness, and at others they say it must be read expansively, including to apply the *mens rea* "knowingly" to the full Felony Provision, a construction that they urge to support their contention that it only criminalizes acts associated with unlawful voting.

[1] References to SB 1260's provisions are cited throughout this Reply as they are proposed to be codified in the Arizona Revised Statutes.

But the rules of statutory interpretation require that the Court examine the plain wording of the statutory text, not the revisionist interpretations (and there are several) set forth in the response briefs. And the plain terms of the Felony Provision are both impermissibly overbroad and hopelessly vague. As the Secretary points out, the Felony Provision could broadly expose county officials to criminal liability simply for following their other statutory duties, threatening to "completely upend the orderly administration of elections in Arizona, make election officials' jobs impossible without threat of criminal prosecution, and exacerbate the already acute staffing shortages in elections offices across the State." Def. Hobbs's Notice Regarding Interpretation of S.B. 1260 ("SOS Not.") at 8 (Sept. 19, 2022), ECF No. 73. For the same reasons, they also threaten Plaintiffs with criminal prosecution for mere voter assistance.

The Cancellation and Removal Provisions are similarly unsustainable: they *require* county recorders to automatically cancel otherwise valid voter registrations and remove people from the AEVL—all without any communication with the affected voter. Even worse, they invite unfounded and dangerous third-party challenges to voter registrations based *solely* on the fact that the person has another voter registration that has not yet been canceled. These challenges, too, threaten to result in the cancellation of registrations of entirely eligible Arizona voters on the eve of the election—again without any notice, confirmation, or communication whatsoever with the impacted voter.

SB 1260 does not describe Arizona's existing practice. Nor is there credible evidence before the Court to support that claim: indeed, as reflected by their respective filings, the Attorney General and the Secretary disagree on what the current practice is, what SB 1260 actually says, and its intent (including whether it says nothing new or fixes a loophole).

The Attorney General and YCRC's argument that enjoining SB 1260 would cause chaos is similarly baseless. SB 1260 has not even gone into effect yet. The status quo is the law as it existed prior to these poorly drafted and hopelessly vague provisions. If an injunction does not issue, and they are permitted to go into effect, it is SB 1260 that will

cause the harm that the Attorney General and YCRC threaten and more. Not only will SB 1260 broadly chill Plaintiffs from engaging in lawful, protected activity, the law itself threatens to cause administrative chaos on the eve of an election by inviting limitless third-party challenges to voter registrations that would overburden county recorders, and force election officials to choose between complying with their duty to send ballots to voters they may know have not cancelled registrations in other states and facing criminal penalties for violating SB 1260.

Plaintiffs cannot rely on the Attorney General's non-binding assertions about the ways in which he will enforce the Felony Provision. If the Attorney General truly believes this lawsuit could have been avoided with "a simple phone call or two," he should enter into a stipulation disavowing enforcement of the Felony Provision in ways that run counter to the First Amendment. AG Mark Brnovich's Resp. in Opp'n of Pls.' Mot. for Prelim. Inj. ("AG Opp'n") at 1 (Sept. 19, 2022), ECF No. 70. And if the parties believe that SB 1260 merely codifies existing practices, they should stipulate to such an interpretation and agree to give the words of SB 1260 no practical effect. They have yet to do that because SB 1260 goes far and beyond existing practices. Plaintiffs therefore respectfully request that this Court enjoin SB 1260.

## ARGUMENT

### I. Plaintiffs' claims are justiciable.

#### A. Plaintiffs' claims as to the Felony Provision are ripe.

In arguing that Plaintiffs' challenge to the Felony Provision is not ripe for review, the Attorney General relies on both ungrounded assertions that Plaintiffs' claims are speculative and his own unenforceable promise that he will not prosecute Plaintiffs pursuant to SB 1260. These assertions do not shield the Felony Provision from this Court's jurisdiction. Plaintiffs have alleged concrete plans to engage in First Amendment-protected conduct that fall within the Felony Provision's plain language. Under the applicable standard—for a pre-enforcement First Amendment challenge to a law yet to take effect—Plaintiffs' claim is justiciable.

As the Ninth Circuit has explained, Article III ripeness "in many cases, coincides squarely with standing's injury in fact prong and can be characterized as standing on a timeline." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009) (quotations omitted). Pre-enforcement "constitutional challenges *based on the First Amendment*," however, "present unique standing considerations." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quotation omitted) (emphasis added). In such challenges, the plaintiff need *not* "suffer[] a direct injury from the challenged restriction" before bringing suit. *Id.* Instead, "the plaintiff may meet constitutional standing requirements by demonstrating a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Id.* (quotation omitted and cleaned up). "To show such a 'realistic danger,' a plaintiff must allege an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder." *Id.* (quotation and alteration omitted). The Ninth Circuit characterizes this standard as "relaxed" relative to the ordinary standing inquiry. *Id.* To satisfy it, plaintiffs need only show "a *risk* or *threat* of injury . . ." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 764 (9th Cir. 2018).

Plaintiffs easily surmount this "low threshold." *Lopez*, 630 F.3d at 792. Plaintiffs have, and wish to continue to, register voters, encourage citizens to vote, and educate voters on how to exercise the franchise. *See infra* at Section II.A.2. As discussed below, each of these activities arguably falls within the broad ambit of the Felony Provision. These allegations provide sufficient details about Plaintiffs' future speech, such as "when, to whom, where, or under what circumstances." *Lopez*, 630 F.3d at 788 (quoting *Thomas*, 220 F.3d at 1139); *see also Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1093 (9th Cir. 2003) (holding group had standing where it planned to spend over $1000 to defeat a California proposition).

The Attorney General does not dispute the sufficiency of these allegations. Instead, he claims Plaintiffs "face no 'genuine threat of imminent prosecution'" because the Attorney General "disavows prosecutions" for the conduct in which Plaintiffs plan to

engage. AG Opp'n at 2 (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000)). But "the government's disavowal must be more than a mere litigation position." *Lopez*, 630 F.3d at 788. To date, neither the Attorney General nor the Secretary has affirmatively disavowed (outside the litigation positions they take in their briefs and filings) that the Felony Provision could apply to Plaintiffs' First Amendment activity, including engaging in voter registration drives and get-out-the-vote efforts, or that Plaintiffs could not be prosecuted under it for this type of activity. This failure to disavow weighs in favor of finding that Plaintiffs suffer a credible fear of prosecution. *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) (collecting cases).

Similarly, the Attorney General complains that Plaintiffs "have not alleged any specific warning or threat to initiate proceedings by the Attorney General, or any prosecutorial agency within Arizona." AG Opp'n at 2. But Plaintiffs need not do so. In a "pre-enforcement challenge that alleges a free speech violation under the First Amendment" such as this one, a plaintiff "need only demonstrate that a threat of potential enforcement will cause him to self-censor, and not follow through with his concrete plan to engage in protected conduct." *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014) (quoting *Thomas*, 220 F.3d at 1139). This harm may occur where, as here, the challenged law has yet to go into effect, because state action is not required for Plaintiffs to suffer the concrete injury of chilled speech. *Cf. Stormans*, 586 F.3d at 1123 (finding, in case where "there ha[d] not been any state action threatening [plaintiffs]" and the challenged law "became effective one day after the lawsuit was brought," plaintiffs' "claims [were] ripe for review" because the law caused harm to plaintiffs, who had to leave their jobs or faced termination because of their religious beliefs); *LSO*, 205 F.3d at 1155 ("Courts have found standing where no one had ever been prosecuted under the challenged provision[s].").

The Attorney General also contends that "Plaintiffs' vagueness challenge is not ripe" because, "[b]y bringing a pre-enforcement vagueness claim, Plaintiffs have deprived the federal courts of the ability to 'consider any limiting construction that a state

court or enforcement agency has proffered.'" AG Opp'n at 9 (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982)) (capitalizations removed). But the Attorney General misreads *Flipside*—the Court there noted that "[i]n evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered"—not that a facial challenge is unripe if no such consideration is yet possible. 455 U.S. at 494 n.5. And, in any event, no such construction has been proffered (other than the Attorney General's unenforceable disavowal in this litigation).

Finally, the Attorney General complains that Plaintiffs' challenge to the Felony Provision is "speculative" because "no evidence has been, or could be, introduced" at this early stage to support Plaintiffs' allegations. AG Opp'n at 9 (quotation omitted). But where a challenged law is "relatively new," courts afford "little weight" to a sparse record of enforcement. *Tingley v. Ferguson*, — F.4th —, No. 21-35815, 2022 WL 4076121, at *7 (9th Cir. Sept. 6, 2022). It is enough that Plaintiffs have "concrete plan[s] to engage in protected conduct," and the "threat of potential enforcement will cause [them] to self-censor." *Protectmarriage.com*, 752 F.3d at 839. For the reasons explained, this "relaxed" standard is satisfied here. *Id.* at 785.

**B. Plaintiffs have standing to challenge the Cancellation and Removal Provisions.**

The Court should reject the standing arguments made regarding the challenges to the Cancellation and Removal Provisions. The Attorney General argues Plaintiffs cannot be injured because SB 1260 simply codifies existing practices, AG Opp'n at 3, while both the Attorney General and YCRC argue that any allegation that practices will change as a result of SB 1260 is speculative. *Id.* at 7; YCRC Resp. to Mot. for Prelim. Inj. ("YCRC Opp'n") at 4–5 (Sept. 19, 2022), ECF No. 72. These arguments are premised on a "reading" of SB 1260 that is wholly divorced from its text. Comparing that text to previously existing guidance for county recorders makes clear that SB 1260 changes, rather than codifies, existing practice. *See Glazer v. State*, 244 Ariz. 612, 614 (2018)

("The best indicator of that intent is the statute's plain language . . . ." (quotation omitted)).

**1. The Cancellation and Removal Provisions do not, and cannot, codify existing practice.**

The argument that the Cancellation and Removal Provisions codify existing practice is not credible on its face, not least of all because the Attorney General, the Secretary, and YCRC all fundamentally disagree as to what the scope of existing practice even is. While the Secretary takes the position that SB 1260 applies to the de-duplication of registrations based on out-of-state registrations, the Attorney General appears to understand SB 1260 to apply only to in-state registrations. *See* AG Opp'n at 3 (referring to "registrations between Arizona counties"); *id.* at 4 (referring to prohibitions on "voters from being registered in multiple counties"); *id.* at 5 (describing SB 1260 as amending to remove duplicate registrations that exist "in another county" and AEVL membership "in another county"). As to the portions of SB 1260 that address the AEVL, YCRC expressly argues that, rather than codify existing practice, SB 1260 does something brand new: it "cleans up a loophole in the existing system" where "previously, a county recorder could not remove a voter from the county's AEVL, even where the county recorder could confirm the voter was registered in multiple counties." YCRC Opp'n at 17.

But even if it the parties could agree on what Arizona's existing practices are, the plain text of the Cancellation and Removal Provisions does not codify existing practice as described by *any* of the response briefs. Neither the Attorney General, Secretary, nor YCRC describe any existing practice that requires automatic cancellation of voter registration based on change of residency. The same cannot be said of the Cancellation Provision, which, on its face, requires cancellation without notice. The Cancellation Provision is composed of two parts. The first part is one sentence of less than 30 words: "The county recorder *shall cancel* a registration . . . when the county recorder receives confirmation from another county recorder that the person registered to vote in that other county." A.R.S. § 16-165(A)(10) (emphasis added). According to both the Attorney General and the Secretary, this one sentence is supposed to codify the entirety of the

state's longstanding and incredibly detailed process for removing duplicate registrations between counties. AG Opp'n at 3; SOS Not. at 4–5. Both cite to the state's now-outdated and unenforceable 2014 Election Procedures Manual ("EPM"), and the 2019 EPM, and describe the state's two-track "hard match, soft match" system to identify duplicate voter registrations, arguing that the single sentence quoted above incorporates all of these involved and nuanced processes. AG Opp'n at 3; SOS Not. at 4–5 & n.3.

One need only conduct a cursory review of the EPMs to which the parties cite to realize how breathtakingly off the mark this argument is. Among other things, the Attorney General and Secretary ask this Court to conclude that the single sentence quoted above silently codifies detailed procedures including (1) what voter information needs to be matched (voter's name, date of birth, last four digits of their social security number, and driver's license number), *see* Ariz. Sec'y of State, *2014 EPM* at 28, (June 2014), https://azsos.gov/sites/default/files/election_procedure_manual_2014.pdf ("2014 EPM")[2]; (2) that there are at least two levels of matches ("hard match" versus a "soft match"), *id.* at 28–29; (3) what constitutes a match at each level ("hard match" meaning a matching of all data fields, and a "soft matching" meaning one or more elements do not match), *id.* at 28–29; and (4) whether this matching process is done manually by the county recorders or through some other system like a computer.

Not only does the statutory text of § 16-165(A)(10) fail to mention any of these things, it actually *conflicts* with the procedure for address matching set forth in the 2014 and 2019 EPMs, which the Attorney General suggests are the operative procedures being codified. AG Opp'n at 6. The 2014 EPM states that the "statewide voter registration system shall notify the counties of the results of the duplicate matching." 2014 EPM at 24; *see also* Ariz. Sec'y of State, *2019 EPM* 23, (Dec. 2019), https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf ("2019 EPM") ("[D]etails of the electronic verification procedures are

[2] The Attorney General also fails to explain why all the processes it claims are codified in the 2014 EPM were taken out of the most recent and legally binding 2019 EPM.

defined in the statewide voter registration system."). But the text of SB 1260 describes an entirely different process, where the trigger for a registration cancellation comes not from a statewide voter registration system but "from another county recorder." A.R.S. § 16-165(A)(10). Second, the 2019 EPM states that the comparison of records is for the purposes of identifying "and *possibly* canceling" duplicate records, 2019 EPM at 23 (emphasis added), but the text of the Cancellation and Removal Provisions do not use such equivocal language—the statutes require *mandatory* cancellation upon confirmation of duplicate registrations. The Removal Provision is composed of a mirroring provision that applies the same cancellation principles to a voter's AEVL membership, A.R.S. § 16-655(Q), and for the same reasons does not codify existing practice.

The second part of the Cancellation Provision provides: "If the county recorder receives credible information that a person has registered to vote in a different county, the county recorder shall confirm the person's voter registration with that other county and, on confirmation, shall cancel the person's registration pursuant to [§ 16-165(A)(10)]." A.R.S. § 16-165(B). The Secretary contends that, in addition to outlining the process for identifying duplicate county voter registrations, § 16-165(B) captures current protocols as they relate to information received from other states that would trigger a cancellation in Arizona. SOS Not. at 5. The Secretary also understands that these provisions require Arizona county recorders to engage in an "individualized inquiry to confirm that the information provided by the election official in the out-of-state jurisdiction matches the Arizona voter record." *Id.* at 6. But again, the statutory text fails to specify any of these procedures—it is not clear whether the reference to a "different county" is within Arizona or another state, and the text does not specify what constitutes the appropriate "confirmation" process or how that might be reconciled with an "individualized inquiry" based on the levels of matching discussed above. *Id.*; 2019 EPM at 35. Similarly, the Removal Provision is also composed of a mirroring provision that applies these same cancellation principles to a voter's AEVL membership. A.R.S. § 16-655(R), and for the same reasons does not codify existing practice.

**2. The Cancellation and Removal Provisions cause Plaintiffs cognizable injury.**

The Attorney General asserts, without any further explanation or citation to any legal authority, that "because SB 1260 only codifies existing practices, it by definition cannot cause Plaintiffs any injury." AG Opp'n at 7. But as discussed, the Cancellation and Removal Provisions *do not* simply codify existing practices: the short, plain text of these provisions cannot reasonably be read to include—and at times does in fact conflict with—the extensive processes the parties claim are being codified.

Both the Attorney General and YCRC also argue that Plaintiffs do not have standing because their injury is based on speculation, conjecture, or hypotheticals. *Id.* at 7; YCRC Opp'n at 5. YCRC argues that under a "plain and reasonable reading of these laws, *only* a person's outdated registration is canceled, and the person is *only* removed from the AEVL in counties where they no longer reside." YCRC Opp'n at 5. But YCRC fails to cite to or quote *where* in the statutory text the law states that only outdated or old AEVL registrations are cancelled. This failure is not an oversight—YCRC cannot cite to this language because it does not exist.[3]

Finally, YCRC argues that Plaintiffs' fear that third-party organizations will utilize SB 1260 to launch broad voter challenges across the state is also speculative. *Id.* at 6. But there is a documented history of the conduct Plaintiffs allege. As the Secretary recognizes in her notice, there are ongoing and present-day examples of coordinated efforts by non-governmental third-party organizations to file widespread voter challenges. *See* SOS Not. at 7 n.5; *see also* Pls.' Mot. Summ. J., *Fair Fight v. True the Vote*, No. 20-cv.0302-SCJ (N.D. Ga. May 16, 2022), ECF No. 156-1 (close to 400,000

[3] YCRC also argues that Plaintiffs' argument is premised on government workers not carrying out their duties competently. YCRC Opp'n at 5. Not so. The issue is that the law does not contain any language that clearly tells election officials *which* registrations should be cancelled, whether based on timing or sequencing of those registrations or list memberships. The statute simply mandates that a county recorder "shall cancel" the registration. A.R.S. § 16-165(A)(10), (B). The Court cannot read into the statute language that does not exist.

voter challenges filed across Georgia between the 2020 General Election and Georgia runoff election).[4] Notably, YCRC and the Attorney General (in joining YCRC's filing) do not disagree that the law allows anyone or any organization to submit information to county recorders under the Cancellation and Removal Provisions in an effort to cancel voter registrations and AEVL membership. Objection to Sec'y Hobbs's Notice ("YCRC Obj.") at 4 (Sept. 20, 2022), ECF No. 75. Thus, it is undisputed that the provision, as drafted, could be used to mount such challenges in Arizona, should the provision go into effect.

**3. An injunction of SB 1260 will remedy Plaintiffs' injuries.**

The Attorney General argues that Plaintiffs cannot establish redressability because an injunction of SB 1260 would still leave in place the same pre-existing procedures. But as noted above, none of the parties before this Court disputes that the text of § 16-165(B) and § 16-544(R) allows non-governmental third parties to submit information to county recorders to facilitate the cancellation of voter registrations and AEVL membership—something no one contends is part of current practice. *See* YCRC Obj. at 3-4; Att'y Gen. Notice of Joinder ("AG Joinder") at 2 (Sept. 20, 2022), ECF No. 77. And as Plaintiffs have clearly articulated, the threat of voter challenges is itself an injury. *See, e.g.*, Mot. Prelim. Inj., Ex. B, Patel Decl. ¶ 19, ECF No. 31-2; SOS Not. at 7 ("[R]equiring election officials to chase down mass allegations by non-governmental third parties would overwhelm county election officials, divert already scarce resources from critical election administration functions, open the door to abusive mass challenges and wrongful cancellations, and generally upend the orderly administration of elections. Such mass voter registration challenges are already occurring in other states.").

Additionally, the cases on which the Attorney General relies are inapposite. Each involved scenarios in which two separate sources of authority could have resulted in the

---

[4] The court "may take judicial notice of court filings and other matters of public record." *See Burbank–Glendale–Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998).

exact same injury to plaintiffs, but plaintiffs only sought to enjoin one. *See Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n,* 457 F.3d 941, 955 (9th Cir. 2006) ("Thus, even if we were to set aside the current NRC rule . . . nothing requires DOT to revisit its *identical* exemption standards.") (emphasis added); *Renne v. GearRenne v. Gear*, 501 U.S. 312, 319 (1991) (finding California statute would also "prevent candidates from mentioning party endorsements in voter pamphlets" just like the statute at issue in the case); *Arizonans for Fair Elections v. Hobbs*, 454 F. Supp. 3d 910, 917 (D. Ariz. 2020), *appeal dismissed*, No. 20-15719, 2020 WL 4073195 (9th Cir. May 19, 2020) ("[E]ven if Plaintiffs succeed in arguing that Title 19 is unconstitutional, the Arizona constitution" which, "by and large, impose the same requirements," "would stand and Plaintiffs' injury would not be redressed.").[5] Here, even if a portion of SB 1260 does in fact overlap with existing practice, other parts of the law, specifically § 16-165(B) and § 16-544(R), authorize third-party challenges that are entirely *new* under Arizona law. Those portions of the Cancellation and Removal Provisions are independent sources of injury to Plaintiffs. Finally, a defendant need not be the exclusive source of a plaintiffs' injury nor entirely responsible for all of it for a plaintiff to satisfy Article III's redressability requirement. *See, e.g.*, *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1157 (9th Cir. 2015) ("But the mere existence of multiple causes of an injury does not defeat redressability . . . . So long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one of multiple causes of the plaintiff's injury."); *I.L. v. Alabama*, 739 F.3d 1273, 1281 (11th Cir. 2014) ("We therefore conclude that removing the assessment ratios would likely redress (at least in

---

[5] All three of these cases refer back to clearly binding regulations, statutes, or constitutional requirements, yet the Attorney General himself has asserted in litigation earlier this year that the 2019 EPM "no longer has the force of law." Pls.' Compl., *Brnovich v. Hobbs*, No. P1300cv202200269 (Ariz. Super. Ct. Apr. 21, 2022), *available at* https://apps.supremecourt.az.gov/docsyav/Cases/Brnovich%20v.%20Hobbs/2022-04-21%20-%20COMPLAINT%20-%20COMPLAINT.pdf. Thus, pursuant to this view, neither the 2014 nor the 2019 EPM are enforceable as law in Arizona.

part) the plaintiffs' injury, and that is enough for standing purposes.").

**II. Plaintiffs have demonstrated a likelihood of success on the merits.**

**A. The Felony Provision violates the Constitution.**

**1. The Felony Provision is Unconstitutionally Vague.**

The Felony Provision is void for vagueness. "A fundamental requirement of due process is that a statute must clearly delineate the conduct it proscribes." *Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998) (quotation omitted), *as amended on denial of reh'g* (July 29, 1998). When a statute is written in such a way that it either "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or "authorize[s] or even encourage[s] arbitrary and discriminatory enforcement," it is void under the vagueness doctrine. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). Where, as here, a law implicates the freedoms secured under the First Amendment, "an even greater degree of specificity and clarity of laws is required." *Foti*, 146 F.3d at 638 (citing *NAACP v. Button*, 371 U.S. 415, 432-33 (1963)); *see also Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."). As a result, when First Amendment rights are at stake, Plaintiffs may bring facial challenges based on a statute's vagueness, and the court's consideration is not limited to the law's impact on Plaintiffs' particular activities. *Foti*, 146 F.3d at 638 n.10.

When engaging in statutory interpretation, courts "start where [they] always do: with the text." *AK Futures LLC v. Boyd Street Distro, LLC*, 35 F.4th 682, 690 (9th Cir. 2022) (quoting *Van Buren v. United States*, 141 S. Ct. 1648, 1654 (2021)). The Felony Provision punishes anyone who "knowingly provides a mechanism for voting to another person who is registered in another state, including by forwarding an early ballot addressed to the other person." The Attorney General and YCRC's largely extratextual arguments seek to obscure what is immediately apparent from a cursory review of the statutory text: it is entirely unclear what the Felony Provision means.

"Mechanism for voting," to begin with, can cover a virtually limitless range of things. Pls.' Mot. for Prelim. Inj. ("Mot. for Prelim. Inj.") at 8 (Sept. 8, 2022), ECF No. 31. YCRC cites the Merriam-Webster definition for "mechanism:" "the fundamental processes involved in or responsible for an action, reaction, or other natural phenomenon." YCRC Opp'n at 7 (quoting *Mechanism*, merriam-webster.com (last visited Sept. 21, 2022)). But this definition only proves Plaintiffs' point. Registering to vote, for example, unquestionably qualifies as a "fundamental[6] process involved in" casting a vote, though the Attorney General and YCRC deny that the Felony Provision reaches such activity. *See, e.g.*, *id.* at 8.[7] And indeed, any given prosecutor may understand a wide range of many different activities that assist voters as part of the "fundamental process involved in voting," including voter education, get-out-the-vote efforts, or assistance in finding one's polling place.

The remainder of the provision only compounds this lack of clarity. The Felony Provision criminalizes anyone who "knowingly *provides* a mechanism for voting." A.R.S. § 16-1016(12) (emphasis added). "Provides," in turn, is defined by Merriam-Webster as "to supply or make available." *Provide*, merriam-webster.com (last visited Sept. 21, 2022). A prosecutor enforcing the Felony Provision would therefore need to determine what it means to "supply or make available" a "fundamental process involved in" voting. Helping someone register to vote would plausibly qualify as "making

---

[6] "Fundamental" is defined as "serving as a basis for supporting existence or determining essential structure or function." *Fundamental*, merriam-webster.com (last visited Sept. 21, 2022). The example accompanying the definition is, "Responsibility is *fundamental* to democracy." *Id.*

[7] YCRC contends that the Felony Provision does not reach voter registration because the term "voter registration" is used elsewhere in the statute (such as in the Cancellation and Removal Provisions), but not here. YCRC Opp'n at 8. But the Felony Provision uses *broader* terminology than its accompanying statutory provisions, so it is unsurprising that specific terms that appear elsewhere are omitted. For example, and as discussed below, though many of the other criminal provisions related to mail-in voting apply only to "ballots," *e.g.,* A.R.S. § 16-1016(4)–(10), the Felony Provision applies to the broader "mechanism for voting." *Id.* § 16-1016(12).

available a fundamental process involved in voting," as might training a voter on how to fill, sign, and mail their ballot. The same could be said for helping a voter apply for an early ballot. The list goes on.

As further confirmation that the Felony Provision lacks any definite scope, it concludes with a single non-exhaustive example of proscribed conduct. Specifically, the provision states that the acts it prohibits "include[] forwarding an early ballot addressed to the other person." In statutory interpretation, the use of the term "includes" "makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012). Aside from this one illustrative example, the Felony Provision offers no further clarification on the scope or limits of its reach. The indeterminacy of "provides a mechanism for voting," together with the lack of any limiting language, leaves Arizonans to wonder at their own peril whether their conduct will violate the Felony Provision. It also provides prosecutors with near unbounded discretion in enforcing a provision that threatens felony-level criminal penalties.

Even the Attorney General and YCRC cannot settle on a single interpretation for the Felony Provision. The Attorney General declares that "mechanism for voting" covers "a ballot and ballot affidavit envelope and nothing else," AG Opp'n at 15, while YCRC cannot make up its mind about what "mechanism for voting" means. A little over a week ago, YCRC endorsed an interpretation similar to the Attorney General's: asserting that "mechanism for voting" means "the actual ballot or other tangential items necessary to cast the ballot, such as a mail-in ballot envelope." YCRC Proposed Mot. to Dismiss at 7, ECF No. 49-1. Now, it offers two new definitions in one brief, one narrower and one broader than the Attorney General's. First, YCRC contends that "'mechanism for voting' . . . consists of the actual ballot." YCRC Opp'n at 7. Five pages later, it contends that it consists of not just the ballot, but other "associated documents"—which YCRC does not define. *Id.* at 12 (stating the Felony Provision "only prohibits the minimal act of forwarding a ballot (or associated documents) to another person, while *knowing* the other

person is registered in a different state").[8] And both YCRC and the Attorney General (through his joinder of YCRC's notice) request that questions about how to interpret the terms "knowingly" and "mechanisms for voting" be certified to the Arizona Supreme Court. YCRC Obj. at 5; AG Joinder at 2. This request all but concedes that the statute is not, on its face, subject to a clear meaning.[9] Thus, this is one of the rare cases in which *no two parties on either side of the case* can agree on the meaning of a statutory provision.

Still worse, none of the Attorney General's or YCRC's proffered interpretations

---

[8] If YCRC cannot go one week (or a single memorandum of law) without changing its mind about the meaning of the Felony Provision, one wonders how a prosecutor several years from now might understand and apply the provision.

[9] Certification is inappropriate in this case, for three reasons. First, the Court may certify a question of statutory interpretation to the Arizona Supreme Court only if the statute is "fairly susceptible to a narrowing construction." *Am. C.L. Union of Nev. v. Heller*, 378 F.3d 979, 986 (9th Cir. 2004) (quoting *Stenberg v. Carhart*, 530 U.S. 914, 945 (2000)). SB 1260 is not so susceptible without wholly rewriting the statute to conform with federal law. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988), *certified question answered sub nom. Commonwealth v. Am. Booksellers Ass'n, Inc.*, 372 S.E.2d 618 (Va. 1988). Second, and relatedly, "[c]ertification is not appropriate where the state court is in no better position than the federal court to interpret the state statute." *Micomonaco v. Washington*, 45 F.3d 316, 322 (9th Cir. 1995); *see also Lehman Bros. v. Schein*, 416 U.S. 386, 390 (1974) ("[M]ere difficulty in ascertaining local law is no excuse for remitting the parties to a state tribunal for the start of another lawsuit."); *Riordan v. State Farm Mut. Auto. Ins. Co.*, 589 F.3d 999, 1009 (9th Cir. 2009) ("Even where state law is unclear, resort to the certification process is not obligatory."). The Arizona Supreme Court is in no better position than this Court to interpret the provisions of SB 1260 and determine the relief to which Plaintiffs are entitled to protect their federal constitutional rights. And third, YCRC has not been granted intervention into this case, and despite its assurances that it "will not cause delay or any prejudice to the existing parties," YCRC Mot. to Intervene at 11, ECF No. 49, YCRC's last-minute request that this Court seek the assistance of the Arizona Supreme Court in resolving questions of statutory interpretation—ones which this Court is fully capable of handling on its own—will only delay these proceedings and severely prejudice Plaintiffs, who seek preliminary injunctive relief to avoid imminent, irreparable harm from SB 1260 going into effect in just a couple of days. Even assuming that the request for certification has been properly raised, the Court should deny both YCRC's request for certification and its Motion to Intervene. Fed. R. Civ. P. 24 ("In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.").

are supported by the statutory text. By YCRC's own chosen dictionary definition, "mechanism" includes any "fundamental processes involved in or responsible for" voting. YCRC Opp'n at 7. As discussed, this definition reaches far beyond a ballot or related materials to include, at a minimum, a voter registration form. Moreover, the term "ballot" is used multiple times in § 16-1016 alone. If the Legislature wished to craft a prohibition that applied *only* to ballots (or "associated documents"), it clearly knew how to do so. *See Cheneau v. Garland*, 997 F.3d 916, 920 (9th Cir. 2021) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.") (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004)).

Ultimately, none of the parties' proposed narrowing constructions can save the Felony Provision.[10] Under YCRC's reading—the narrowest among the proffered interpretations—the Felony Provision reaches only the one example it expressly lists, "forwarding an early ballot addressed to the other person." Even under such a narrow (and implausible) reading, it remains unclear whether county officials who "knowingly" send absentee ballots to individuals with out-of-state registrations are subject to felony prosecution. As described above, there is a strong possibility that third-party organizations will send the names of voters registered in other states to county officials in the hopes that those voters will be removed from the rolls. If a county recorder receives this information, they now "know" of the multiple registrations and must then decide between sending ballots to these voters and risking committing a felony under SB 1260, or withholding the ballots and potentially committing a misdemeanor under § 16-1009. SOS Not. at 8. That county recorders must walk this tightrope is yet another example of the harms caused by SB 1260's confounding text and construction.[11] It is also highly

[10] The Attorney General and YCRC do not dispute that "statutory interpretation falls under the purview of the courts—not an elected member of the executive branch." YCRC Not. at 4; AG Joinder at 2.

[11] The Secretary requests that the Court read an actual knowledge requirement into the

unlikely that the Legislature intended to criminalize only the forwarding of mail ballots to individuals registered out of state given its use of the word "including," which clearly communicates that the single example provided is not exhaustive. *See Christopher*, 567 U.S. at 162. Also, were YCRC's interpretation correct, then half of the Felony Provision would be surplusage. A.R.S. § 16-1016(12); *Freytag v. Comm'r*, 501 U.S. 868, 877 (1991) ("Our cases consistently have expressed a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment." (quotation marks omitted)). Plainly, the Legislature intended to criminalize more than just forwarding a ballot; it was for this reason that they decided to include the other language in the Felony Provision: "provid[ing]" a "mechanism for voting."

The Felony Provision's *mens rea* requirement, moreover, does not cure the provision's vagueness. YCRC argues that because the term "knowingly" appears at the beginning of the provision, it applies both to (1) "provid[ing] a mechanism for voting to another person" and (2) "who is registered in another state." YCRC Opp'n at 8. But YCRC's interpretation misapplies the "series-qualifier canon," which only applies where there is "a straightforward, parallel construction that involves all nouns or verbs in a series." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012); YCRC Opp'n at 8 (citing same). This canon would apply, for example, to a statute that made it a crime to "knowingly skip, run, or jump." The Felony Provision contains no such parallel series of verbs that the adverb "knowingly" could modify. Under the most natural reading of the provision, "knowingly" only modifies "provide," and the remainder of the provision lacks a scienter requirement. The Court should reject YCRC's strained attempt to extend "knowingly" where it does not belong.

In any event, even if the Court were to accept YCRC's proposed interpretation of the Felony Provision's *mens rea* requirement, the provision's vagueness would persist.

---

Felony Provision. SOS Not. at 8. Though this reading might limit the statute's reach to instances where a county recorder credits the information they receive from a third-party organization, it will do little to cure the vagueness of the Felony Provision.

As described, the primary mischief in the provision is the indeterminate meanings of "mechanism" and "provide." The mere fact that a potential defendant is aware that the person they are interacting with is registered in another state does nothing to clarify whether they are "providing" that person with a "mechanism for voting." *Cf. Forbes v. Napolitano*, 236 F.3d 1009, 1013 (9th Cir. 2000) (finding scienter requirement did not cure vagueness in statute criminalizing "experimentation" or "investigation" involving fetal tissue from induced abortions, because "a doctor might knowingly use fetal tissue" for a test that the physician believes is permissible under the statute, but which the state considers to be illegal). Put differently, whether a person is aware of where the person they are speaking to is registered has nothing to do with whether they are providing that person with a mechanism for voting.

Finally, the Attorney General and YCRC erroneously suggest that Plaintiffs must show that the Felony Provision is vague in all its applications to succeed. YCRC Opp'n at 10–11; AG Opp'n at 10–11. The Supreme Court rejected this view in *Johnson v. United States*, 576 U.S. 591, 602 (2015) ("[O]ur holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."). Instead, the standard is what it has always been: a statute is void for vagueness if "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Id.* at 595. The Felony Provision runs afoul of this standard and is thus unconstitutional.

**2. The Felony Provision is Overbroad.**

The Felony Provision is also unconstitutionally overbroad. Under the overbreadth doctrine, a law that inhibits free speech is facially invalid "if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *City of Chicago*, 527 U.S. at 52 (quotation omitted). The First Amendment protects "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). In *Meyer*, the Supreme Court struck down a law prohibiting the payment

of initiative petition circulators, finding that petition circulation "involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Id*. at 428. Courts have applied *Meyer* to strike down laws that burdened voter registration drives, because such drives "encourage citizens to register to vote," which is "core First Amendment activity." *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (cleaned up) (quotation marks omitted); *League of Women Voters of Fla. v. Browning*, 863 F. Supp.2d 1155, 1158–59 (N.D. Fla. 2012).

As discussed, the Felony Provision, by its plain terms, arguably encompasses a nearly limitless range of activities. Among these are many activities that Plaintiffs engage in, including voter registration drives, digital campaigns informing voters where they can vote, phone banking, and general voter education campaigns. *See* Mot. for Prelim. Inj., Ex. A, Cole Decl. ¶¶ 5, 7–13, 23, ECF No. 31-1; Patel Decl. ¶¶ 5, 7, 10–14; Mot. Prelim. Inj., Ex. C, Cecil Decl. ¶¶ 4–5, 8, 10–11, ECF No. 31-3. Each of these activities necessarily involves the communication of a desire for others to register to vote and cast their ballots successfully. Because each might be considered "providing a mechanism for voting" under the Felony Provision, Plaintiffs and their members will steer clear of such activities. Cole Decl. ¶¶ 5, 7–13, 23; Patel Decl. ¶¶ 5, 7, 10–14; Cecil Decl. ¶¶ 4–5, 8, 10–11. This, in turn, "limits the number of voices who will convey [Plaintiffs'] message" and makes it less likely that Plaintiffs will achieve their goals of registering voters and building power. *See Meyer*, 486 U.S. at 423.

The Felony Provision is not, as the Attorney General and YCRC contend, targeted exclusively at non-expressive conduct. YCRC Opp'n at 9; AG Opp'n at 11. The cases cited by YCRC actually help to illustrate why the Felony Provision regulates protected expression. YCRC Opp'n at 9 (citing *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 392–93 (9th Cir. 2016); *Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018)). *Feldman* and *Knox* both involved laws prohibiting the collection of absentee ballots. Though courts have come to different conclusions as to whether that type of activity is also communicative and protected as core political speech, ballot collection is at least

clearly defined, and the courts that have found it is not protected under the First Amendment have focused on the non-speech aspects of that activity. By contrast, the Felony Provision arguably *directly* regulates a wide range of communications. For example, by giving someone instructions on how to register to vote, a volunteer might be "provid[ing] a mechanism for voting," *i.e.*, by making voter registration available to that person.

Like its vagueness infirmities, the Felony Provision's overbreadth is not rehabilitated by its inclusion of a *mens rea* requirement. Even if the Court accepts the contention that the Felony Provision only punishes those who are aware that a voter is registered out of state, the provision would still chill Plaintiffs' speech. For example, if in a conversation with a voter about registering, a volunteer learns that the voter has just moved to Arizona and is still registered in their previous state of residence, the volunteer will err on the side of caution and cut off the conversation rather than risk criminal felony liability. *See* Cole Decl. ¶¶ 8–11, 15; Patel Decl. ¶¶ 10–11; Cecil Decl. ¶ 8; *Protectmarriage.com*, 752 F.3d at 839 (observing there is injury in fact if a plaintiff has "concrete plan[s] to engage in protected conduct" and "self-censor[s]" due to "threat of potential enforcement").

### B. The Cancellation and Removal Provisions fail to provide notice to voters prior to cancellation of their voter registration, as required under the NVRA and Due Process Clause.

#### 1. The Cancellation Provision violates and is preempted by the NVRA.

The Cancellation Provision adds subsection (10) to A.R.S. § 16-165(A), which requires a county recorder to automatically cancel a voter registration upon receiving "confirmation from another county recorder that the person registered has registered to vote in that other county." A.R.S. § 16-165(A)(10). The preceding statutory provisions, *id.* § 16-165(A)(1)–(9), already reflect the substantive portions of Section 8 of the NVRA, requiring a county recorder to cancel a voter registration in specific circumstances including: at the registrant's request, if the registrant was adjudicated as

incapacitated, upon the registrant's conviction of a felony, or upon receipt of written confirmation from the registrant that they have changed residence. *Compare*, *e.g.*, *id.* §§ 16-165(A)(1)–(4), (8)–(9), with 52 U.S.C. § 20507(a)(3)–(4). Yet subsection (10) says something entirely different: by its plain language, county recorders must cancel a voter's registration upon one condition only—confirmation from another county recorder that a person has registered to vote in another county. A.R.S. § 16-165(A)(10). Unlike other subsections of § 16-165(A), which generally require at least an attempt to contact the registrant, *see, e.g.*, *id.* § 16-165(A)(1), (8)–(9), subsection (10) has no explicit requirement to reach out to the affected registrant at all. Nor does subsection (10) cross-reference other subsections that incorporate the NVRA's important protective requirements. *See, e.g.*, *id.* § 16-544(E) (requiring county recorders to contact voters before removing them from the active early voting list).

Subsection (10) thus violates both the letter and the spirit of the NVRA. The NVRA provides a comprehensive list of specific enumerated grounds upon which a voter registration may be cancelled without notice. 52 U.S.C. § 20501. None of these grounds are described in Subsection (10). The same is true for § 16-165(B), which requires county recorders, upon receipt of "credible information that a person has registered to vote in a different county," to confirm that other registration with the other county and, upon confirmation, to cancel the registration pursuant to § 16-165(A)(10). The Seventh Circuit has already squarely addressed this issue in a case holding that an analogous Indiana statute violated the NVRA. In *League of Women Voters v. Sullivan*, the court reviewed an Indiana law allowing the state to cancel a voter's registration "without either direct communication from the voter or compliance with the NVRA's notice-and-waiting procedures." 5 F.4th 714, 724, 731 (7th Cir. 2021). The court held that this statute conflicted with, and was thus preempted by, the NVRA. YCRC claims that *Sullivan* does not apply because the Cancellation Provision only applies to multiple in-state registrations, while *Sullivan* involved multiple registrations in different states. YCRC Opp'n at 12. But this reasoning fails for two independent reasons. First, it is not at all

clear that the Cancellation Provision "only applies to duplicate in-state registrations," as YCRC claims without support.[12] *Id*. This ambiguity is underscored by the fact that the Secretary interprets § 16-165(B) as applying to "out-of-state jurisdictions" as well. *See* SOS Not. at 5–6. Second, even if the Cancellation Provision were limited to multiple in-state registrations, the Seventh Circuit's reasoning in *Sullivan* would still apply. The NVRA does not distinguish between state and county registrations when it comes to the requirements for canceling a voter registration, *see* 52 U.S.C. § 20507(j)(2) (defining "registrar's jurisdiction" as either a county or other "larger geographic area").[13]

Indeed, the Cancellation Provision's potential for allowing voter purges close to the election represents precisely the type of harm that the NVRA was meant to address: the purpose of the NVRA was to protect the "fundamental right" to vote while ensuring that "accurate and current voter registration rolls are maintained," and this is directly implicated when a state cancels otherwise valid voter registrations without providing notice to the affected voter, in violation of the NVRA's express requirements. 52 U.S.C. § 20501. Moreover, the need to enjoin state laws that violate the NVRA becomes more urgent as election day approaches; thus, the time period in which a state must remediate issues reported to them under the NVRA shortens as the election nears. *See* 52 U.S.C. § 20510(b) (providing for 90 days to correct a violation generally, 20 days if the NVRA violation occurred within 120 days of a federal election, and no notice requirement if the NVRA violation occurred within 30 days of a federal election). Despite YCRC's argument that voters can check their registration status online, this does not satisfy NVRA's express notice-and-wait and direct-communication requirements. YCRC Opp'n

---

[12] The Secretary interprets this provision as applying to information provided from out-of-state election officials. SOS Not. at 5–6.

[13] YCRC also claims that SB 1260 complies with the NVRA's explicit notice-and-wait and direct-communication requirements because "[r]e-registering to vote in a new county constitutes a 'request of the registrant' to be removed from the voting roles in the prior county." YCRC Opp'n at 2, 11, 12. But this exact argument was properly rejected by the Seventh Circuit in *Common Cause Ind. v. Lawson*, 937 F.3d 944, 960 (7th Cir. 2019).

at 14 n.9.[14]

Finally, the Attorney General and YCRC claim that the Cancellation Provision *cannot* violate the NVRA because the State is required to comply with the NVRA pursuant to § 16-168(J). *See, e.g.*, *id.* at 2 ("[S]tate law already requires the Secretary of State to comply with the NVRA while eliminating duplicate voters from the statewide database."), 11 ("[T]he federal and state laws are in harmony."). This argument should be rejected out of hand. Arizona would be required to comply with the NVRA whether or not § 16-168(J) was on the books. Having a blanket state statute requiring the Secretary to comply with the NVRA does not automatically insulate all of Arizona's election laws from judicial review. Were that the case, any state would be able to insulate its statutes from federal preemption by simply including a clause that all state laws must comply with federal law. Federal rights are not so easily derogated.

**2. The Cancellation and Removal Provisions Violate Procedural Due Process.**

The Cancellation and Removal Provisions require county recorders to cancel a voter's registration and remove them from the AEVL upon "confirmation" from another county that the person has registered to vote in the other county. A.R.S. §§ 16-165(A)(10), 16-544(Q). They do not contain *any* language specifying which county recorder shall cancel the voter registration or remove the person from the AEVL, nor do they contain any language specifying which voter registration should be canceled or

---

[14] To the extent that the Attorney General and YCRC also argue that the Cancellation Provision does not violate the NVRA because the cancellations contemplated under the statute only impact a person's state-level and not federal-level registration, YCRC Proposed Mot. Dismiss at 16; AG Opp'n at 17 (incorporating same), they fundamentally misconstrue Arizona's voter registration system. While Arizona has separate federal and state voter rolls based on which form a voter uses to register to vote in Arizona, nothing in the text of SB 1260 limits cancellations only to a voter's *state* registration. Additionally, this argument is premised on Arizona voters being on both lists, instead of what the 2019 EPM suggests, which is that a voter is either on the state *or* the federal list. *See* 2019 EPM at 41. If a voter has only one registration, cancellation of that registration, no matter which list it is on, will lead to complete disenfranchisement.

which AEVL the person should be removed from. In other words, the Cancellation and Removal Provisions contain no details at all regarding how to ensure that only stale voter registrations are canceled or removed. Canceling a person's active voter registration that they intend to use solely because they have registered in another jurisdiction—without providing them notice or receiving their consent—unlawfully strips Arizonans of their fundamental right to vote and violates procedural due process.[15] *See Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1357 (D. Ariz. 1990) ("Because voting is a fundamental right, the right to vote is a 'liberty' interest which may not be confiscated without due process.").

Despite the lack of anything that supports its reading in the statutory text, YCRC insists that "under a plain and reasonable reading of these laws, only a person's outdated registration is cancelled, and the person is only removed from the AEVL in counties where they no longer reside." YCRC Opp'n at 5.[16] As discussed, this may be how YCRC imagines or hopes the law will take effect, but it has no basis in the actual statutory text. *See supra* Section I.B.2.[17] Further, even if only "outdated" registration information were

[15] The Attorney General claims that there is no liberty interest in "being registered to vote in two counties at the same time." AG Opp'n at 14. But that is not the right Plaintiffs assert: the Cancellation and Removal Provisions violate procedural due process because they *disenfranchise eligible Arizona voters* solely for having registered in another jurisdiction. Arizonans have a liberty interest in voting. Both Arizona and federal law allow for county recorders to cancel voter registrations in specific circumstances without violating due process. *See, e.g.*, A.R.S. §§ 16-165(A)(1)–(4), (8)–(9); 52 U.S.C. § 20507(a)(3)–(4). The Attorney General overlooks that the Cancellation and Removal Provisions lack those established procedural safeguards and, in so doing, violate procedural due process.

[16] Similarly, the Attorney General claims that state law requires county recorders to "coordinat[e]" through the state voter registration database. AG Opp'n at 1. But such coordination is simply not present in the Cancellation Provisions' language, which only provides that county recorders "confirm[]" that the voter is registered in another county before canceling their registration. A.R.S. §§ 16-165(A)(10), 16-544(Q).

[17] The Attorney General also misstates § 16-101(B) in claiming that Arizona has a "statutory requirement that voters are only qualified to be registered at one residence" and that "registrants are statutorily disqualified from registering to vote at more than one

removed, it would still violate procedural due process to do so without providing the person with notice or receiving their consent. As the Seventh Circuit recognized in *Lawson*, 937 F.3d at 960, a person may for a variety of reasons move back to their prior address intending to use that registration to lawfully vote, yet they would be disenfranchised without notice under the Cancellation and Removal Provisions under those circumstances.

The Cancellation and Removal Provisions also allow unidentified third parties to provide "credible information that a person has registered to vote in a different county" to county recorders, who must then confirm the information with other county recorders and, upon confirmation, cancel a voter's registration and remove them from the AEVL. A.R.S. §§ 16-165(B), 16-544(R). Again, there is no clarifying language specifying important details such as who may provide such information or what constitutes "credible information." But this time, YCRC changes course and takes an expansive view that the "credible information" can come from anyone. *See* YCRC Opp'n at 2 ("[I]f the 'legislature had intended to include' a source requirement for credible information in SB 1260's Cancellation and Removal Provisions, 'it would have expressly done so.'" (quoting *Est. of Braden ex rel. Gabaldon v. State*, 228 Ariz. 323, 327 ¶ 15 (2011))). The Secretary takes a more narrow (and contrasting) view, stating a belief that "non-governmental third party entities" cannot provide "credible information" because it would "come from neither the voter directly nor another election official with authority over voter registration," and admitting that "any contrary interpretation raises potential

---

residence." AG Opp'n at 4, 14. Section 16-101(B) states that "[a]n individual has only one residence *for purposes of this title*"—nothing prevents a person from *changing* their residence and thereby exercising their right to vote with a newer (or older) voter registration. In other words, just because a person has only one residence at a time does not mean that they must cancel all their older voter registrations; they are only legally required to be a resident at the time of registering to vote and at least 29 days before the next election. *See* A.R.S. § 16-125 (a voter who moves within 29 days of the election is "deemed to be a resident and registered elector of the county from which the elector moved until the day after the [election]").

conflicts with federal law" and "would be extremely disruptive to and impose significant burdens on both election officials and voters." SOS Not. at 2. Regardless of where the "credible information" comes from, the Cancellation and Removal Provisions still violate procedural due process because they allow for third-party voter challenges based solely on a person having multiple voter registrations—which has nothing to do with a person's eligibility to vote in Arizona, and which would cause people to have their voter registrations canceled and their AEVL memberships revoked without notice or consent.

Moreover, the Cancellation and Removal Provisions will impose severe burdens not only on organizations involved in voter mobilization and registration, including Plaintiffs and their members and constituents, but on every Arizona voter who has more than one voter registration. All these individuals will be at risk of having their voter registrations canceled and AEVL memberships revoked without any notice and without providing their consent. The only way to prevent possible disenfranchisement will be for these individuals to either continuously and repeatedly check their voter registration status, or affirmatively cancel all other voter registrations. Both options are far more than "inconvenient," YCRC Opp'n at 15—they will require a massive diversion of time and resources for Plaintiffs and Arizona voters.[18] To make matters worse, absent an injunction, all these burdens will transpire right before voting commences in Arizona for the 2022 November election—as the Attorney General himself points out. AG Opp'n at 17. These monumental burdens, moreover, lack any reasonable relation to a legitimate purpose. Though the Attorney General claims the Cancellation and Removal Provisions are necessary to protect the integrity of the electoral process by "preventing duplicate registrations" and "preventing voters from having multiple, voteable early ballots mailed automatically," he fails to explain how either circumstance has led to, or bears any

---

[18] To speak of only one possible example, Arizona voters who have frequently moved may not recall all the places where they have previously registered to vote, so it may not even be possible for them to affirmatively cancel all their other voter registrations.

relation to, actual instances of voter fraud.[19] AG Opp'n at 15.

## III. Plaintiffs will suffer irreparable injury.

As Plaintiffs have explained in detail, SB 1260 does not codify Arizona's existing procedures. The text of the statute, which is quite short, does not capture the nuance and varying conceptions reflected in existing practice as described by the Attorney General and the Secretary in their filings. And notably, none of the parties dispute that SB 1260 includes provisions that would newly allow third parties to trigger the voter registration cancellation process in a dangerous way that has not existed in Arizona before. *See supra* Section I.B. Therefore, whether SB 1260 codifies existing practice is entirely irrelevant—there are elements of the statute that go beyond the scope of whatever may constitute existing practice, and absent an injunction, Plaintiffs will suffer irreparable harm because SB 1260 will cause the disenfranchisement of individual voters and the infringement of constitutional rights. *See* Mot. Prelim. Inj. at 16–17; Patel Decl. ¶ 19; SOS Not. at 7.

With respect to the Felony Provision, the Attorney General asks the Court to ignore Plaintiffs' cognizable injuries by asserting that "Plaintiffs have not articulated a plan that runs afoul of the Attorney General's interpretation of the Felony Provision." AG Opp'n at 16. But because the Attorney General's limiting interpretation is neither supported by the plain text of the statute nor legally binding, *see supra* Sections I.A., II.A., Plaintiffs cannot, and should not be required to, rely on it. The Attorney General's proclamations in this case do not preclude him from changing his mind or taking a different view in the future. Nor do they preclude a different Attorney General from taking a different view.[20] Nor does the Attorney General's view guarantee that a court

---

[19] YCRC claims to be investigating a total of 16 cases of voter fraud, and the Attorney General has investigated only 36 voter fraud cases since 2010. Jones Decl. ¶¶ 13, 15 n.6, ECF No. 72.

[20] This is especially important in light of Arizona's upcoming election for a new Attorney General in November, which does not feature current Attorney General Mark Brnovich as a candidate. Ariz. Sec'y of State, 2022 General Election, https://apps.arizona.vote/electioninfo/elections/2022-general-election/state/2522/33/0

will agree. It is for this very reason that the Supreme Court has held that it will not uphold a statute against a First Amendment challenge based on the fact that prosecutors have said they plan to interpret the statute narrowly. *United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

Additionally, because the "views of the State's attorney general, while attracting respectful consideration, do not garner controlling weight," *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018), the Attorney General's opinion on how the Felony Provision should be interpreted neither has legal authority nor magically erases any threat of enforcement against Plaintiffs. *See also Ruiz v. Hull*, 191 Ariz. 441, 449 (1998) (concluding "[o]pinions of the Attorney General are advisory," and where Attorney General's "proffered narrowing construction does not comport with the plain wording of the" statutory authority, the Attorney General's construction should be rejected and construction should instead be guided by the "plain meaning rule").

Finally, YCRC's argument that Plaintiffs' injuries constitute speculative, "unsupported and conclusory statements," YCRC Opp'n at 16, ignores the detailed and unchallenged declarations Plaintiffs have submitted in support of their motion for injunctive relief.

## IV. Plaintiffs did not unduly delay in seeking relief.

Plaintiffs did not unduly delay in seeking relief.[21] SB 1260 was signed into law in June 2022, this lawsuit was filed two months after it was signed, and the Motion for Preliminary Injunction was filed just one month later after Plaintiffs amended their complaint. Plaintiffs have not waited years to challenge a law that has been on the books—the basis upon which the court denied a request for a preliminary injunction in

(last visited Sept. 21, 2022).

[21] Curiously, the Attorney General simultaneously contends that Plaintiffs sought relief too soon, before their claims were ripe for review.

the single case cited by the Attorney General. *See* AG Opp'n at 16 (citing *Oakland Tribune, Inc. v. Chronicle Publishing Co*., 762 F.2d 1374, 1374 (9th Cir. 1985) (denying request for preliminary injunction of contract provision customary in the industry for many years)).

Finally, the Attorney General and YCRC's attempts to invoke *Purcell* flip that doctrine on its head. Absent an injunction, SB 1260 will go into effect on September 24, 2022, and impose an entirely *new* set of laws in Arizona. Voters who cast their ballots in the August primary elections and vote in the upcoming November election will have voted under two different sets of legal requirements over the course of just a few months. Had the legislature wanted to avoid concerns about voter confusion and the impact on elections—concerns that animate the *Purcell* doctrine—it could have delayed SB 1260's effective date past this next election, as it has already done with other election legislation this session. *See* S.B. 1638, § 4, 55th Leg., 2d Reg. Sess. (Ariz. 2022) (providing that H.B. 2492, which imposes new documentary proof of citizenship requirements, "is effective from and after December 31, 2022").

*Purcell*, then, favors Plaintiffs. Enjoining SB 1260 will put a pause on any last-minute changes to Arizona's election laws. But if SB 1260 goes into effect, the chaos that could arise due to an influx of voter challenges across Arizona, as the Secretary has articulated, SOS Not. at 7, is precisely the type of confusion and eleventh-hour disorder that weighs in *favor* of an injunction. For these reasons, the *Purcell* doctrine is entirely inapplicable to weigh against the grant of relief here.

**CONCLUSION**

Plaintiffs' Motion for Preliminary Injunction should be granted.

Dated: September 21, 2022

_/s/ Daniel A. Arellano_
Roy Herrera (No. 032901)
Daniel A. Arellano (No. 032304)
**HERRERA ARELLANO LLP**
530 East McDowell Road, Suite 107-150
Phoenix, Arizona 85004-1500

Aria C. Branch*
Daniel J. Cohen*
Joel Ramirez*
Tina Meng*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002

* Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2022, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants.

*/s/ Daniel A. Arellano*