**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Arizona Alliance for Retired Americans, et al., | No. CV-22-01374-PHX-GMS |
| Plaintiffs, | **ORDER** |
| v. |  |
| Katie Hobbs, et al., |  |
| Defendants. |  |

Before the Court is Arizona Alliance for Retired Americans, Voto Latino, and Priorities USA's (collectively "Plaintiffs") Motion for Preliminary Injunction (Doc. 31). Plaintiffs seek to enjoin several provisions of recently enacted Arizona Senate Bill ("SB") 1260, including A.R.S § 16-1016(12) ("Felony Provision"), A.R.S § 16-165(A)(10), (B) ("Cancellation Provisions"), and A.R.S § 16-544(Q)–(R) ("Removal Provisions"), (collectively "Challenged Provisions").  Plaintiffs claim that: **(1)** the Felony Provision violates the First and Fourteenth Amendments; **(2)** the Cancellation Provisions violate and are preempted by the National Voter Registration Act ("NVRA"); and **(3)** the Cancellation and Removal Provisions violate due process.  For the following reasons, the Court grants the motion with respect to the Felony and Cancellation Provisions and denies the motion with respect to the Removal Provisions.

## BACKGROUND

Plaintiffs, a collection of voter advocacy organizations, bring this Motion because they claim that the Challenged Provisions of SB 1260 "make[] it unjustifiably harder for lawful Arizona voters to exercise their right to vote and threaten[] Plaintiffs with criminal penalties for engaging in core First Amendment activity." (Doc. 31 at 1.) Defendants are Arizona's Secretary of State and Attorney General, and county recorders for each of Arizona's counties. The Yuma County Republican Committee ("YCRC") permissively intervened.

During its 2022 legislative session, the Arizona Senate passed SB 1260. The Bill "[m]odifies the criteria for voter registration cancellations, active early voting list regulations and violations associated with illegal voting." Ariz. H.B. Summary, 2022 Reg. Sess. S.B. 1260. Among the provisions of SB 1260 are the Challenged Provisions: A.R.S § 16-1016(12) ("Felony Provision"), A.R.S § 16-165(A)(10), (B) ("Cancellation Provisions"), and A.R.S § 16-544(Q)–(R) ("Removal Provisions"). The Felony Provision states that "[a] person is guilty of a class 5 felony who . . . [k]nowingly provides a mechanism for voting to another person who is registered in another state, including by forwarding an early ballot addressed to the other person." A.R.S § 16-1016(12). The first Cancellation Provision dictates that "[t]he county recorder shall cancel a registration . . . [w]hen the county recorder receives confirmation from another county recorder that the person registered has registered to vote in that other county." A.R.S § 16-165(A)(10). The second Cancellation Provision further states that "if a county recorder receives credible information that a person has registered to vote in a different county, the county recorder shall confirm the person's voter registration with that other county and, on confirmation, shall cancel the person's registration." A.R.S. § 16-165(B). And the Removal Provisions provide new mandates for county recorders:

> Q. When the county recorder receives confirmation from another county that a person registered has registered to vote in that other county, the county recorder shall remove that person from the active early voting list.

1

2       R. If the county recorder receives credible information that a person
has registered to vote in a different county, the county recorder shall
3  confirm the person's voter registration with that other county and, on
confirmation, shall remove that person from the county's active early
4  voting list pursuant to subsection Q of this section.

5

6    A.R.S § 16-544(Q)–(R).

7  <strong>DISCUSSION</strong>

8    **I.**    **Legal Standard**

9         A plaintiff seeking a preliminary injunction must establish that: **(1)** they are likely

10 to succeed on the merits of their claims, **(2)** they will suffer irreparable harm in the absence

11 of preliminary relief, **(3)** the balance of equities tips supports a preliminary injunction, and

12 **(4)** an injunction is in the public interest.  *Coffman v. Queen of Valley Med. Ctr.*, 895 F.3d

13 717, 725 (9th Cir. 2018).  This framework "creates a continuum: the less certain the district

14 court is of the likelihood of success on the merits, the more plaintiffs must convince the

15 district court that the public interest and balance of hardships tip in their favor."  *Sw. Voter*

16 *Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003); *see also All. for*

17 *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

18   **II.**    **Likelihood of Success**

19        First, the Court will address whether Plaintiffs are likely to succeed on the merits of

20 their claims concerning the Challenged Provisions.  However, Article III standing is a

21 jurisdictional requirement that must exist before a court can consider the merits of the

22 litigants' claims.  *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019).  Here, whether Plaintiffs

23 can establish standing is inextricably linked with the potential merits of their claims.

24 Accordingly, the Court addresses whether Plaintiffs have met Article III standing

25 requirements in the following discussions regarding the merits.  *Yazzie v. Hobbs*, 977 F.3d

26 964, 966 (9th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22

27 (2008)) (noting that standing requires **(1)** an injury in fact that is concrete and

28 particularized" and "actual or imminent; **(2)** a causal connection between the injury and the

conduct complained of; and that **(3)** the injury will likely be redressed by a favorable decision.").

### A. Felony Provision

SB 1260 creates a new felony for those "who . . . [k]nowingly provide[] a mechanism for voting to another person who is registered in another state, including by forwarding an early ballot addressed to the other person." A.R.S § 16-1016(12).  The parties contest whether the statute fairly defines: **(a)** what sorts of things constitute a "mechanism for voting" and **(b)** how a party might subject themselves to criminal liability for providing such a mechanism.

A statute is unconstitutionally vague if it fails to provide "the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Legislation "may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused." *Musser v. Utah*, 333 U.S. 95, 97 (1948); *see also United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013).  Thus, penal statutes must provide the definition of an offense with "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  And while federal courts ordinarily must construe criminal statutes to preserve their constitutionality, they cannot "re-write a statute to save it." *State v. Arevalo*, 249 Ariz. 370, 373 (2020).  And, contrary to Defendants' assertions, a "law may be invalidated on vagueness grounds even if it could conceivably have some valid application." *Phelps v. Budge*, 188 F. App'x 616, 619 (9th Cir. 2006) (quoting *Forbes v. Napolitano*, 236 F.3d 1009, 1012 (9th Cir.2000).

"In assessing whether a state statute is unconstitutionally vague, federal courts must look to the plain language of the statute." *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 941–42 (9th Cir. 1997)).  SB 1260 does not define "mechanism for voting," so the

Court "construes that [phrase] according to its ordinary, contemporary, common meaning." *United States v. W.R. Grace*, 504 F.3d 745 (9th Cir. 2007). Generally speaking, mechanism refers to "a process, technique, or system for achieving a result," or "the fundamental processes involved in or responsible for an action." *Mechanism*, Merriam Webster (2022); *see also Mechanism*, Oxford Eng. Dictionary ("[G]enerally: the interconnection of parts in any complex process," "[a] means by which an effect or result is produced."). Thus, in the context of SB 1260, the ordinary meaning of "mechanism for voting" could include any necessary items involved in the process of voting.

And because the statute specifies that an example of a "mechanism for voting" includes an early ballot, it is clear the statute intends to criminalize more than just providing an early ballot as such a mechanism. Indeed, the other felony provisions listed in A.R.S. § 16-1016 expressly reference "ballots," "ballot boxes," "poll lists," "polling places," and "election returns," which also suggests that "mechanism for voting" would be superfluous if it only included ballots. A.R.S. § 16-1016 (5), (6), (9), (11); *Marquez-Reyes v. Garland*, 36 F.4th 1195, 1204 (9th Cir. 2022) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."). But there is nothing else in the text that informs or limits what other items might constitute "mechanisms for voting."

Plaintiffs claim that many of their election-related activities like registering voters and encouraging citizens to vote might be considered "providing mechanisms for voting." Indeed, at the least, the statutory text necessarily fails to foreclose the possibility that a voter registration form is a "mechanism for voting" since registration is a prerequisite to being able to vote. It is entirely possible that Plaintiffs, in registering newly arrived residents, may be charged with knowledge that those new residents didn't cancel their previous voter registrations. Plaintiffs would thus have committed the new felony if registering a voter is a mechanism for voting. It is further understandable that absent clarity as to whether registration is or is not a mechanism for voting, the statute will chill the

Plaintiffs' registration activities or cause them to incur much greater expense and time in conducting such activities. As it stands now, however, whether their registration or other efforts are criminal will turn on the judgment of law enforcement officers, prosecutors, and judges—not the Arizona legislature, which failed to define "mechanism for voting" with sufficient clarity. *Knox v. Brnovich*, 907 F.3d 1167, 1182 (9th Cir. 2018) (quoting *United States v. Evans*, 333 U.S. 483, 486–87 (1948)) ("[O]rdinary notions of fair play and the settled rules of law," are violated if police officers, prosecutors, and judges are essentially "defining crimes and fixing penalties" by filling statutory gaps "so large that doing so becomes essentially legislative."). Indeed, criminal statutes that prohibit "providing" something typically survive vagueness challenges where legislatures explicitly define the object being provided. *See, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) (upholding a statute that prohibited "knowingly provid[ing] material support . . . to a foreign terrorist organization" where the definition of "material support or resources" and the scienter requirement were carefully defined in other portions of the statutory scheme); *United States v. Kissler*, 937 F. Supp. 884, 887 (D. Alaska 1996) (upholding a provision that prohibited knowingly providing big game hunters with transportation services where the statute defined both "big game" and "transportation services"). But, because the legislature failed to do so in SB 1260, the Felony Provision is too vague to give people of ordinary intelligence notice of whether knowingly registering out-of-state voters is a crime.

The Attorney General's position that Plaintiffs are not likely to be prosecuted for this conduct does not change the Court's conclusion.[1] Specifically, the Attorney General

---

[1] Defendants promises that they will not enforce the provision in the upcoming election also do not persuade the Court that Plaintiffs lack standing. The Ninth Circuit has held that a failure to disavow enforcement coupled with self-censorship to avoid enforcement is sufficient to show "a causal connection between the injury and the conduct complained of." *Tingley v. Ferguson*, -- F.4th --, 2022 WL 4076121, at *7 (9th Cir. 2022). The Plaintiffs have shown that they will engage in self-censorship. And the Attorney General cannot disavow enforcement because he cannot bind County Attorneys or future Attorneys General to his interpretation of the statute. Additionally, the third standing requirement "carries 'little weight' when the challenged law is 'relatively new,' and the record contains little information as to enforcement." *California Trucking Ass'n v. Bonta*, 996 F.3d 644 (9th Cir. 2021). The Felony Provision was passed June 8, 2022, and goes into effect on September 24, 2022. So, the statute has never been enforced. This lack of enforcement history, however, is a product of the law's newness, and is not indicative of the State's commitment not to enforce the provision against voter advocacy organizations.

avows to the Court that Plaintiffs are at no danger of prosecution for registration activities because he is the only law enforcement agency served with the complaint, and he interprets "mechanism for voting" to mean a ballot and a ballot affidavit envelope and nothing else.[2] But, as the Attorney General acknowledges, his interpretation will not bind his successor in office, and he will only remain in office for three more months. The validity of state elections and their processes are prominent issues in the current election to choose a new Attorney General, and the candidates may have views that in no way reflect his own. The Court then, is obliged to consider the actual text of the statute. And, as outlined above, the Felony Provision and the surrounding text do not offer enough guidance about what falls within the definition of "mechanism for voting." It is, therefore, not possible for a person of average intelligence to know how it will be interpreted. As a result, many of Plaintiffs' organizational efforts like voter registration drives might fall within the Felony Provision.[3] Accordingly, the Court finds that Plaintiffs are likely to succeed on the merits of their claims that the Felony Provision is void for vagueness under the Fourteenth Amendment's Due Process Clause.[4]

## B. Cancellation Provisions

Next, the Court will consider whether Plaintiffs are likely to succeed on the merits of their claim that the Cancellation Provisions violate and are preempted by the NVRA. The provisions of the NVRA that are implicated by SB 1260 are those that impose

---

[2] Similarly, he reads "knowingly" in SB 1260 to modify the entire provision—i.e., the person must have knowledge that they are both "provid[ing] a mechanism for voting to another person" and that person is "registered in another state."

[3] Thus, Plaintiffs have demonstrated an injury in fact for the purposes of Article III standing because they have shown "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and . . . a credible threat of prosecution thereunder." *Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1005–06 (9th Cir. 2011) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). If the Felony Provision is not enjoined, Plaintiffs will need to self-censor their voter registration efforts.

[4] Because the Court finds that Plaintiffs are likely to succeed on their due process claims, it does not address their First Amendment arguments.

requirements on the removal of a voter from the voting rolls.[5]  Those provisions require a state to adhere to certain procedures before it can remove a voter from the voting rolls in any jurisdiction.  Specifically, the voter can directly request that state officials remove the voter's registration from the voting roll.  52 U.S.C. § 20507(a)(3)(A).  Or, if the state believes a registrant has changed residence, the state may remove the voter's name from the voting roll if "the registrant . . . has confirmed in writing that the registrant has changed residence to a place outside the registrar's jurisdiction" *Id.* § 20507(d)(1)(A).  Alternatively, the state may remove a voter after providing notice followed by a specified waiting period.  *Id.* § 20507(d)(1)(B).  Under the NVRA, at least one of these procedures must be followed.

Despite that statute, however, the plain text of SB 1260's Cancellation Provisions requires county recorders to cancel a voter's registration when they "receive[] confirmation from another county recorder that the person registered has registered to vote in that other county," A.R.S. § 16-165(A)(10), or when they "receive[] credible information that a person has registered to vote in a different county . . . [and] confirm the person's voter registration with that other county," A.R.S. § 16-165(B).  Neither provision requires direct authorization from voters or compliance with the NVRA's notice provisions prior to a county recorder removing a voter's registration from the rolls.

The Defendants acknowledge that Arizona's voter registration forms do not have a place for voters to request that their old registrations be cancelled.  Nevertheless, the Intervenor takes the position that when a voter registers to vote in a new location, the voter's new registration impliedly constitutes that voter's request to remove his or her registration from the voter rolls at the voter's previous address pursuant to subsection (a)(3)(a) of § 20507 of the NVRA.  The remaining State Defendants do not make this argument but they do contend that the Election Procedures Manual ("EPM") cancellation process used by the state in cancelling a registration correctly verifies the single identity of a voter registered in two separate counties such that the voter's second registration

---

[5] The NVRA has other notice provisions for removal of a voter from the official lists that are not at issue here.  *See, e.g.*, 52 U.S.C § 20507(3), (4).

impliedly fulfills the NVRA's requirement that a "registrant confirm[s] in writing that the registrant has changed residence to a place outside the registrar's jurisdiction" under subsection (d).  52 U.S.C. § 20507(d)(1)(A).

The rationale for both of these arguments is rejected by two Seventh Circuit cases that are indistinguishable from this case on all of the relevant points.  In 2019, the Seventh Circuit held that Indiana's voter registration cancellation scheme was preempted by the NVRA.  *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019).  In *Common Cause*, Indiana law used a voter-registration matching system called Crosscheck.  *Id.* at 957.  The law required that election officials cancel a voter's registration upon finding a match through the Crosscheck system that confirmed a voter was registered in Indiana and in another state.  *Id.*  The Act did away with Indiana's previous law, which required Indiana officials to directly contact the voter or verify whether the registrar received a written request from the voter to cancel her Indiana registration.  *Id.*  The Seventh Circuit flatly rejected the argument that registration in a different state amounted to a "request to remove that person's name from the rolls in the previous State of residence."  *Id.* at 960.  The Court stated that "[d]rawing an inference from information . . . indicating that a voter has registered in another jurisdiction is neither a request for removal nor is it from the registrant, as required under the terms of § 20507(a)(3)."  *Id.*  Next, the Seventh Circuit rejected the argument that a re-registration in a new state is sufficient confirmation in writing from the registrant under 52 U.S.C. § 20507(d)(1)(A).  The Court emphasized that once the state has information that a voter has changed residences and is no longer eligible to vote, it must "either 'confirm' the information *with the registrant* before removing the person from the rolls or attempt to provide personal notice."  *Id.* at 961–62.

In a second case, *League of Women Voters of Indiana, Inc. v. Sullivan*, 5 F.4th 714 (7th Cir. 2021), the Seventh Circuit struck certain revisions the Indiana Legislature made to the voter registration law in the wake of *Common Cause*.  Under the revised law, Indiana election officials were required to cancel an Indiana registration if they could determine three factors related to the person's change of residence and voter registration, including

that the person "authorized the cancellation of her Indiana registration when she registered in the second state." *Id.* at 723.  The problem, however, was that under the new law, if election officials received notice from another election division that a voter was registered there, they could consider the "notice as confirmation that the individual is registered in another jurisdiction and has requested cancellation of the Indiana registration." *Id.* at 724. The Court found that because the state could cancel voter registrations "even if Indiana [did] not possess proof that the voter himself ever submitted such an authorization" to cancel his registration, it "impermissibly allow[ed] Indiana to cancel a voter's registration without either direct communication from the voter or compliance with the NVRA's notice-and-waiting procedures." *Id.*

The Intervenor argues that the Seventh Circuit cases are distinguishable from this case because the systems in both Indiana cases only dealt with a voter who would be moving out of state rather than a voter who was moving within the state.  Thus, they assert, the Seventh Circuit's clear prohibition on implying voter authorization for registration removal only applies in cases of an interstate move, and SB 1260 only applies to cases of intrastate transfer.  Intervenor's argument is wrong on both counts.  It both ignores the facts underlying the Indiana cases and misreads the plain text of SB 1260.

As an initial matter, Indiana's voter registration form, unlike Arizona's, "includes a spot where the new registrant is invited expressly to authorize the cancellation of any prior registration she may have." *League of Women Voters*, 5 F.4th at 719–20.  The registration forms of nine other states contain similar provisions.  *Id.*  In those states, then, intrastate moves by voters who re-register would not be an issue under the NVRA because the voter registration form itself contains an explicit request by the voter to cancel her previous and identified registration.  Or, put differently, that form fulfills the NVRA's requirement that the voter herself request the cancellation of her previous registration.  Accordingly, the question of intrastate transfer would rarely (if ever) arise in Indiana, and, in any event, would not provide the basis for entering a preliminary injunction as it does here, since Arizona's registration forms contain no such explicit request from the voter herself.

Further, despite the Attorney General and Intervenor's assertions to the contrary, SB 1260 does not only apply to people who move from one county in Arizona to another county in Arizona.  The Secretary of State, the underlying EPM regulations, and the plain text of the statute demonstrate otherwise.  In her interpretation, the Secretary of State explained that the Provisions are intended to cover registrations in other Arizona counties *and* registrations in any out-of-state jurisdiction to which a voter has relocated.  (Doc. 73 at 5.)  Nothing in the text of the statute limits its application to only county recorders in Arizona.  The Court will take the statute at face value and will not read in such a limitation. *Emmert Indus. Corp. v. Artisan Assocs.*, 497 F.3d 982, 987 (9th Cir. 2007) ("Where a statute is complete and unambiguous on its face, additional terms should not be read into the statute.").

Nevertheless, the State Defendants alternatively argue that because the procedures in its EPM only permit summary cancellation by a county recorder of a voter's registration after finding a "hard match" between two Arizona registrations, they have sufficient information to meet the requirement in subsection (d) that they receive written confirmation from the registrant of a change in residence.  Even if it were acceptable under the statute to presume voter confirmation under such conditions, and this Court believes that the holding of the Seventh Circuit is the better view, there is at least one additional problem with this argument—SB 1260 does not codify the procedures that Defendants allege the state follows.

Defendants point to the 2014 Elections Procedure Manual and the 2019 Elections Procedure Manual to indicate that the Cancellation Provisions requires a "hard match" between two registrations before a subsection (d) cancellation, as outlined in the 2014 EPM.  However, the 2019 EPM is the operative manual, and that manual does not outline the procedures directing county recorders to determine whether a duplicate registration is a "hard match" or a "soft match" before cancelling a registration.  Thus, the Secretary of State informs the Court that "she has no currently available means of binding the counties" and enforcing the EPM procedures to ensure that the two voters match.  (Doc. 73 at 9–10.)

Thus, even if the Court agreed with the argument that the current EPM procedures establish sufficient confirmation from the voter that she has moved jurisdictions, SB 1260 is not at all identical to the EPM, and it does not incorporate the critical portions of the EPM procedures that Defendants say provide confirmation from the voter that she has moved jurisdictions (i.e., the "hard match" procedures).[6]

Further, even if the Court were to accept that Arizona satisfies the NVRA requirements when county recorders cancel a registration based on a "hard match" between two Arizona registrations, Defendants assert that a "hard match" would only be possible between two Arizona registrations but would not be possible between an Arizona registration and a registration from another state.  In other words, there would not be sufficient information to construe the subsequent registration from another state as confirmation from the voter that she has moved jurisdictions.  Nevertheless, SB 1260 would require cancellation of that person's Arizona voter registration.  In essence, SB 1260 appears to allow county recorders to treat "soft matches" and "hard matches" all the same, and neither type of match requires county recorders to receive direct communication from the registrant.

Ultimately, the statute itself requires only that county recorders receive "confirmation" from another county recorder that an individual has registered in that county before they are required to cancel that person's Arizona voter registration.  This scheme is precisely the scheme that the Seventh Circuit rejected in both *Common Cause* and *Sullivan*.  As noted above, the Seventh Circuit rejected the notion that re-registration amounts to a request to be removed from the voter rolls.  *Common Cause*, 937 F.3d at 960. While, as the Intervenor points out, the reports of the legislative committees that initially considered the NVRA prior to its passage opine that a voter's registration in another

---

[6] The reasoning in the preceding paragraph also explains why the Defendants' argument that Plaintiffs do not have standing because their injury is not redressable is likely to fail. Enjoining the Cancellation Provisions will not leave the Plaintiffs with the same injury that they would suffer if the provision took effect because the provision is not "entirely redundant" of the EPM procedures. *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1158 (9th Cir. 2015).  "[T]he mere existence of multiple causes of an injury does not defeat redressability." *Id.* at 1157.

jurisdiction would impliedly constitute a request by a voter to have his previous registration removed under subsection (a) of the statute, S. Rep. No. 103-6, at 31; H.R. Rep. No. 103-9, at 14–15, that specification is nowhere in the statute.  It is simply not "conducive to a genuine effectuation of legislative intent to give legislative force to each snippet of analysis . . . in committee reports, that are increasingly unreliable evidence of what the voting Members of Congress had in mind." *Blanchard v. Bergeron*, 489 U.S. 87, 99 (1989) (Scalia, J., concurring).  Of course, the committee report—not being the legislation itself— never considers by what criteria the officials from the two locations would determine whether they were dealing with the same voter.  This concern is obviated by the textual provisions in subsection (d).  Subsection (d) aims to prevent local election officials from having standardless discretion in determining whether they are dealing with the same voter before removing her from the voter rolls.  It thus avoids the possibility of either honest mistakes by such officials or the abuse of their discretion.  The Court thus adopts the Seventh Circuit's interpretation of the requirements of the NVRA.

As for what constitutes appropriate confirmation from the voter that she has moved jurisdictions, both the NVRA and the Seventh Circuit in interpreting it make clear that the confirmation must unequivocally come *from the voter*.  *Id.*; *Sullivan*, 5 F.4th at 724.  In *Sullivan*, written notice from another state that an individual had registered there was insufficient confirmation from the voter.  5 F.4th at 720.  Here, a county recorder's confirmation with *another county recorder* is similarly insufficient to constitute confirmation *from the registrant* under the NVRA.  The fact that Arizona's statutory election scheme generally requires state election law to comply with the NVRA does not ameliorate specific provisions of the law that violate it.  A.R.S. § 16-168(J) (stating that any provisions in Arizona law regarding the removal of voters from the registration database must be "consistent with the national voter registration act of 1993 and the help America vote act of 2002").

 The correct interpretation of the NVRA is in direct conflict with the requirements of the new Cancellation Provisions of SB 1260.  Congress has the power in appropriate

circumstances to preempt state law via the Supremacy Clause.  U.S. Const. Art. VI, cl. 2. Generally, courts should not assume that federal acts preempt state law "unless that [is] the clear and manifest purpose of Congress."  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992).  However, "the assumption that Congress is reluctant to pre-empt does not hold when Congress acts under" the Elections Clause, "which empowers Congress to 'make or alter' state election regulations." U.S. Const. Art. I, § 4, cl. 1; *Ariz. v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14 (2013).  Accordingly, because the Cancellation Provisions conflict with the NVRA, they are likely preempted.[7]  As such, the Plaintiffs are likely to succeed on the merits.

### C. Removal Provisions

Lastly, the Court will consider whether the Plaintiffs are likely to succeed on the merits on their claim that the Removal Provisions violate the Due Process Clause.  There is an important distinction between the Cancellation Provisions and the Removal Provisions.  The Cancellation Provisions govern the cancellation of a person's registration to vote.  Once a person's registration is cancelled, that voter loses her authorization to vote and cannot vote.  The Removal Provisions, however, do not pertain to the cancellation of a voter's registration.  Rather, as their provisions plainly demonstrate, they relate to a voter's removal from the Active Early Voting List ("AEVL").  Removal from the AEVL means that a voter will not receive a ballot by mail prior to the election.  But it does not cancel the voter's registration.  It thus does not prevent the voter from voting at her polling place on Election Day if she did not receive a mail-in ballot.

---

[7] For all the above reasons, the Court also does not find persuasive the arguments that Plaintiffs do not have Article III standing to challenge the provision.  First, any argument that there is no injury in fact because the provision merely codifies existing procedures fails because of the facial differences between the statute and the underlying procedures, as well as the conflict between the statute and the NVRA.  This apparent conflict establishes the risk that Plaintiffs will need to divert resources to assist in canceling former voter registrations "because failing to do so would risk the voter's registration being cancelled . . . without notice."  (Doc. 31 at 1); *Common Cause Indiana*, 937 F.3d at 951 (finding adequate injury in fact when new law would cause Plaintiffs "to expend . . . limited financial resources on rolling back the effects of the bill").

The Defendants indicated to the Court that the Removal Provisions, like the Cancellation Provisions, were designed to remove the voter from only the AEVL of the county where voting officials suppose she previously resided, even though the statute does not explicitly say as much.  (Doc. 70 at 3, 13; Doc. 73 at 5–6; Doc. 85 at 13.)  This Court, in applying its analysis, accepts this interpretation as binding.  As with the Cancellation Provisions, however, there is no legally binding mechanism that guides county recorders' discretion when they must determine whether a voter is registered in another county before removing her from the AEVL.  In the absence of any binding mechanism for Defendants' determination, the statute provides no clear guidance as to which AEVL enrollment should be cancelled.

Because the Court has already found that Plaintiff is likely to succeed on the merits of their claim that the Cancellation Provisions are preempted by the NVRA, it did not consider whether the Cancellation Provisions also likely violated the Due Process Clause.  But that is the singular argument that Plaintiff advances as to the Removal Provisions.  Because, at least in a facial challenge, the Removal Provisions do not impose a sufficiently severe burden on all voters and leave alternate means for a voter to exercise her fundamental voting rights, the Court does not find (at this point) that Plaintiffs are likely to succeed on the merits of a facial due process challenge to the Removal Provisions.[8]  It, therefore, does not grant a preliminary injunction on this claim.

The Court does not find a facial due process challenge likely to succeed for the following reasons:

---

[8] Although it is not completely clear that Plaintiffs bring their due process claim as a facial challenge, where a claim has characteristics of both kinds of challenges, the Supreme Court has held that the implications of plaintiffs' claims are "[t]he important point." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).  For example, in *John Doe No. 1 v. Reed*, the plaintiffs requested an injunction of a state election law that would apply to the public at large.  *Id.* at 194.  There, the Court held that plaintiffs had to "satisfy our standards for a facial challenge" to the extent that the injunction would "reach beyond the[ir] particular circumstances," even though the claim "obviously ha[d] characteristics of both" facial and as-applied challenges.  *Id.* Accordingly, this Court treats Plaintiffs' claims as a facial challenge to the Removal Provisions to the extent that they request injunctive relief that would apply to all voters in the state.  Plaintiffs nevertheless have standing to challenge the Removal Provisions because they will need to divert resources to combat the effects of the law and their members could be at risk of having their AEVL registration removed without notice.

The Ninth Circuit has held that the *Anderson-Burdick* framework is the proper test to apply to a procedural due process challenge against an election law. *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1195 (9th Cir. 2021). Under the *Anderson-Burdick* framework, the Court must "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments' . . . against 'the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* at 1187 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). "[A] State's important regulatory interests generally suffice to justify non-severe burdens on voting rights." *Id.* at 1195.

The first step in evaluating a law under the *Anderson-Burdick* framework is considering the burden placed on Plaintiffs' rights. "The severity of the burden the election law imposes on the plaintiff's rights dictates the level of scrutiny applied by the court." *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 729 (9th Cir. 2015). Here, the burden that the Removal Provisions impose on Plaintiffs' rights is two-fold: first, a voter may be wrongfully removed from the AEVL; second, the statute does not require the county recorders to notify voters of their removal from the AEVL, whether correct or not.

As it pertains to the potential incorrect removal from an AEVL list, and the ability to vote by mail, the Supreme Court has explained that the fundamental right to vote does not extend to a "claimed right to receive absentee ballots." *McDonald v. Bd. Of Election Comm'rs of Chicago*, 394 U.S. 802, 807 (1969). At least one circuit court has held that the same principle applies to the right to vote by mail, emphasizing that "unless a state's actions make it harder to cast a ballot at all, the right to vote is not at stake." *Tully v. Okeson*, 977 F.3d 608, 611 (7th Cir. 2020).

The more precise issue presented, here, however, is once a state has established the ability to vote by mail, is it a violation of the Due Process Clause to cancel a voter's access to the mail-in ballot procedure without notice? The Ninth Circuit does not appear to have addressed the question squarely. Two recent Ninth Circuit cases and a District of Arizona case address similar burdens associated with mail-in ballots. The first case is *Arizona*

*Democratic Party v. Hobbs*, which addressed Arizona's Election Day deadline for correcting a missing signature on a mail-in ballot.  18 F.4th at 1183.  In that case, the Court held that although Plaintiffs risked disenfranchisement if they did not properly cure invalid mail-in ballot signatures by Election Day, "[t]he relevant burden for constitutional purposes is the small burden of signing the affidavit or, if the voter fails to sign, of correcting the missing signature by election day." *Id.* at 1189.

The second Ninth Circuit case is *Short v. Brown*, which addressed a California structure that automatically sent mail-in ballots to voters in some counties, while requiring that voters in other counties affirmatively request a mail-in ballot.  893 F.3d 671, 677 (9th Cir. 2018).  In that case, the Court also found that the burden on the Plaintiffs was slight because "[e]ven assuming that a state could convert the status quo into a burden by facilitating the process for some but not all, the burden in this case is . . . certainly not 'severe' enough to trigger strict scrutiny." *Id.* at 678.

Finally, in *Mi Familia Vota v. Hobbs*, this Court previously considered an Arizona law that required the removal of an individual from the AEVL if the voter failed to vote using an early ballot in all elections for two election cycles.  -- F. Supp. 3d --, 2022 WL 2290559, at *5 (D. Ariz. 2022).  Notably, under the law at issue, the county recorder was required to give notice to the voter that she was being removed from the AEVL. *Id.*  The Court found the Plaintiffs did not show a "moderate or severe burden on the right to vote" because the law "at most affects (but does not eliminate) the ability of Arizona residents to use an alternative voting method—voting by mail—that is not constitutionally required." *Id.* at *20.  The Court emphasized that any individuals who were removed from the list may "re-register for the [Permanent Early Voting List] PEVL and/or vote in person." *Id.*

When the facts of this case are compared to those of *Arizona Democratic Party*, the ultimate risk of disenfranchisement here is actually lower because in *Arizona Democratic Party*, the voter would not have been aware that her ballot was invalidated until after the election certification deadline.  In this case, however, a voter would presumably be aware that she did not receive a ballot prior to Election Day and, even if she did not have that

realization until Election Day itself, could still exercise her right to vote at her local precinct consistent with *Mi Familia Vota*.

The burden facing voters in this case, is very similar to the burden of those who did not have mail-in voting status in *Short*. In *Short* however, those who did not have vote-by-mail status were presumably aware of that fact. Even if they were not aware that mail-in status was a possibility, they still knew in advance that they needed to vote at their polling place. If they were aware, they knew that if they did not wish to vote at their polling place on the date of the election, they would have to register sufficiently in advance to receive mail-in status. The difference here, is that a voter whose status on the AEVL was wrongfully removed would only realize there was a problem when she did not receive her mail-in ballot prior to Election Day. A voter may have this realization in enough time prior to the election to renew her mail voting status, or she may have to go to the polls on election day to vote, prior to renewing her status, again consistent with *Mi Familia Vota*. In either case, however, according to *Short,* the act and the necessity of having to initiate or re-initiate status on the AEVL is not a burden that rises to constitutional dimension as a facial challenge.

The availability of alternate means of voting weighs against a finding that the Removal Provisions severely burden the right to vote. *Daunt v. Benson*, 999 F.3d 299, 311 (6th Cir. 2021) (holding that an election law imposes a severe burden if it leaves "few alternate means of access to the ballot"). As this Court noted in *Mi Familia Vota*, Arizona's AEVL is an "alternative voting method" that "remains substantially more 'generous' than the voting practices of more than half of its sister states." *Id.* at 21. Thus, even if an individual is removed from the AEVL in her current county without notification, the removal does not impact her registration or her ability to vote in the county where she is lawfully registered. The Court recognizes that in the realm of voter circumstances there may be individual or even systematic circumstances where the cancellation of the AEVL registration combined with the absence of notice may result in a voter's loss of her franchise right without notice. If there might be such systematic or individual instances,

however, the Plaintiffs have not sufficiently advanced those possibilities here.

The second step of the *Anderson-Burdick* test is determining whether the asserted burden is justified by the interests of the State. *Ariz. Democratic Party*, 18 F.4th at 1187. The Court must consider "the precise interests put forward by the State as justifications for the burden imposed by its rule" to ensure that they, in fact, justify the rule. *Id.* at 1190. When the burden is not significant, the law "trigger[s] less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Ariz. Democratic Party*, 18 F.4th at 1187. In this case, the state asserts an interest in "preventing voters from having multiple, voteable early ballots mailed automatically." (Doc. 70 at 21.) Deterring and detecting election fraud is undoubtedly an important state interest. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008). This interest is reasonably related to the cancellation of an individual's duplicate registration for the AEVL. It is reasonable to conclude that preventing an individual from automatically receiving a ballot by mail if she is registered in two different counties assists the state in preventing and deterring election fraud. Because the Removal Provision is justified by the state's important interest in maintaining a fair election, it satisfies the constitutional due process requirements under the *Anderson-Burdick* test. As such, the Plaintiffs are not likely to succeed on their claim that the Removal Provision violates procedural due process.

## III.   Irreparable Harm

Next, the Court must examine whether Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). "Irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial." *Optinrealbig.com LLC v. Ironport Sys.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004). Additionally, "[h]arm that is 'merely speculative' will not support injunctive relief." *Am. Trucking Ass'ns*, 559 F.3d at 1057. Plaintiffs have demonstrated a likelihood of irreparable harm on their challenges to the Felony and Cancellation Provisions but not with respect to the Removal Provisions.

1

2    Although the Attorney General's office alleges that they will not prosecute

3    Plaintiffs' regular activities, it is not clear that the Attorney General's promise can last

4    longer than the few months remaining in his service.  Thus, the vagueness of the Felony

5    Provision creates a state of uncertainty and self-censorship for Plaintiffs' lawful activities.

6    This is a sufficient irreparable harm because the loss of constitutional rights like due

7    process "for even minimal periods of time, unquestionably constitutes irreparable injury."

8    *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

9    Plaintiffs have also demonstrated that they are likely to suffer irreparable harm in

10    the absence of an injunction against the Cancellation Provisions to the extent that Plaintiffs

11    assert that they must divert resources to combat the negative effects of the law.  This is the

12    precise injury that the Court acknowledged constituted irreparable harm in *Common Cause*

13    *Indiana*, 327 F. Supp. 3d 1139, 1154 (S.D. Ind. 2018) ("Harm has already been imposed

14    on Common Cause by impacting its ability to fulfill its mission and by diverting its limited

15    resources.").  Additionally, Defendants allege that potential voter disenfranchisement is

16    entirely speculative and unlikely, or in the alternative, that Plaintiffs' members will suffer

17    the same harm even if the Court enjoins the Cancellation Provisions because "SB 1260

18    largely codifies procedures required to implement the voter registration database as

19    mandated by Arizona law." (Doc. 70 at 21.)  As addressed above, however, the underlying

20    procedures and the text of SB 1260 are not identical.  To the extent that SB 1260 grants

21    county recorders even broader authority to cancel voter registrations without the voter's

22    written confirmation, it puts the Plaintiffs' members at risk of disenfranchisement.  "The

23    denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—

24    even once—is an irreparable harm." *Jones v. Governor of Florida*, 950 F.3d 795, 828 (11th

25    Cir. 2020).  Thus, the likelihood of irreparable harm factor tips in Plaintiffs' favor on the

26    Cancellation Provisions.

27    However, as outlined above, the Removal Provisions do not risk disenfranchisement

28    to the same degree as the Cancellation Provisions.  Because, even if Plaintiffs' AEVL

1    registrations are wrongfully cancelled, they have alternative means of exercising their right

2    to vote.  The likelihood of irreparable harm is therefore lower as to the Removal Provisions.

3    **IV.      Balance of the Equities and Public Interest**

4           To receive a preliminary injunction, "movants must show that the balance of

5    equities tips in their favor" and "that an injunction is in the public interest."  *Winter*, 555

6    U.S. at 24; *see also Miracle v. Hobbs*, 427 F. Supp. 3d 1150, 1164 (D. Ariz. 2019), *aff'd*,

7    808 F. App'x 470 (9th Cir. 2020) (noting that the court considers these inquiries in tandem).

8    On the one hand, "[t]here is no doubt that the right to vote is fundamental."  *Sw. Voter*

9    *Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (quoting *Reynolds*

10   *v. Sims*, 377 U.S. 533, 555, 585 (1964)).   On the other, "a State indisputably has a

11   compelling interest in preserving the integrity of its election process."  *Eu v. San Francisco*

12   *County Democratic Central Comm.*, 489 U.S. 214, 231 (1989).  And under *Purcell v.*

13   *Gonzalez*, courts considering motions for preliminary injunctions that challenge state

14   election laws are required to weigh "considerations specific to election cases" like the

15   disenfranchising effect of orders that disrupt the status quo "just weeks before an election."

16   549 U.S. 1, 4 (2006).

17          Each of the parties invokes *Purcell* to suggest that the equities tip in their favor.

18   Notably, however, Defendants have not suggested that enjoining the Felony Provision

19   would prevent the State from administering existing election procedures.  And the Ninth

20   Circuit has held that where "the operation of a statute that would impose felony sanctions

21   on third parties for previously legal action in connection with elections when . . . the statute

22   has no impact on the election process itself," a court "preserv[es] the status quo" by issuing

23   an injunction.  *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 370 (9th Cir. 2016).

24   Thus, *Purcell* tips in Plaintiff's favor.

25          The equitable considerations implicated by the Cancellation and Removal

26   Provisions also tip in Plaintiffs' favor.  Defendants assert that the Cancellation and

27   Removal Provisions merely codify existing procedures, so enjoining them would "call into

28   question decades old laws and procedures that cancel duplicate voter registrations."  (Doc.

70 at 23.)  However, if the State's decades old laws and procedures are preempted, calling them into question does not cut against the public interest.  "[T]he right to vote is sacrosanct and preservative of all other rights," so it is clearly in the public interest that Arizona's election procedures comply with the NVRA and constitutional due process.     *Ariz. Democratic Party v. Ariz. Republican Party*, No. CV-16-03752-PHX-JJT, 2016 WL 8669978, at *13 (D. Ariz. Nov. 4, 2016).  And where "a case concerns a statewide election" and "threatens to interfere with [the] ability to vote . . .  the Ninth Circuit has made clear this implicates the public interest in a particularly acute way."  *Shelley*, 344 F.3d at 919; *Short v. Brown*, No. 218CV00421TLNKJN, 2018 WL 1941762, at *6 (E.D. Cal. Apr. 25, 2018), *aff'd*, 893 F.3d 671 (9th Cir. 2018).  The equities and the public interest tip in Plaintiffs' favor.

## CONCLUSION

Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 31) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 31) with respect to A.R.S. § 16-1016(12) (Felony Provision) is **GRANTED** and the Court preliminarily enjoins the law's operation.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 31) with respect to A.R.S. § 16-165(A)(10) and § 16-165(B) is **GRANTED** and the Court preliminarily enjoins the law's operation.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction with respect to A.R.S. § 16-544(Q)–(R) is **DENIED.**

Dated this 26th day of September, 2022.

G. Murray Snow
G. Murray Snow
Chief United States District Judge