**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Brunn (Beau) W. Roysden III (#028698)
Drew C. Ensign (#025463)
Jennifer J. Wright (#027145)
*Assistant Attorneys General*
OFFICE OF THE ARIZONA ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, Arizona 85004
Telephone: (602) 542-3333
Facsimile: (602) 542-8308
beau.roysden@azag.gov
drew.ensign@azag.gov
jennifer.wright@azag.gov
acl@azag.gov

*Attorneys for Defendant Mark Brnovich*
*Attorney General of the State of Arizona*

Brett W. Johnson (#021527)
Eric H. Spencer (#022707)
Colin P. Ahler (#023879)
Tracy A. Olson (#034616)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: bwjohnson@swlaw.com
espencer@swlaw.com
cahler@swlaw.com
tolson@swlaw.com

*Attorneys for Intervenor-Defendant*
*Yuma County Republican Committee*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Arizona Alliance for Retired Americans; et al.,

Plaintiffs,

v.

Katie Hobbs, in her official capacity as Secretary of State for the State of Arizona, et al.,

Defendants.

No. 2:22-CV-01374-GMS

**EMERGENCY MOTION FOR STAY OF PRELIMINARY INJUNCTION PENDING APPEAL**

**(EXPEDITED CONSIDERATION WITHOUT ORAL ARGUMENT REQUESTED)**

Pursuant to Federal Rule of Civil Procedure 62(d) and Federal Rule of Appellate Procedure (8)(a)(1), Defendant Attorney General Mark Brnovich ("AG") and Intervenor-Defendant Yuma County Republican Committee ("YCRC") respectfully request that the Court stay its September 26, 2022, Order (the "Order") (Doc. 87) preliminarily enjoining the implementation and enforcement of the Cancellation and Felony Provisions of SB 1260, pending resolution of the AG's and YCRC's appeal of the Order.

## I. INTRODUCTION

SB 1260 was largely intended to codify the existing common-sense procedure for managing duplicate voter registrations used by county recorders for decades. Despite this practically universal understanding of SB 1260 and expressing no issues with the system that has been in-place since at least 2014, Plaintiffs ignited this litigation with confusing and limitless readings divorced from the plain meaning of the text, statutory context, legislative history, and common practice. What is worse, Plaintiffs' expedited challenge to SB 1260's reasonable election regulation, while claiming complexity due to hyperbole and speculation, was unjustifiably done at the eleventh hour—specifically causing election administration confusion that the U.S. Supreme Court has regularly disavowed immediately prior to an election. Under these circumstances, a stay pending appeal is appropriate.

First, the Court's Order covers novel issues of statewide importance. Despite months of waiting, expedited briefing on Plaintiffs' request for preliminary relief revealed numerous disagreements of statutory interpretation. These legal questions of first impression are sufficiently weighty to justify a stay pending the Ninth Circuit's review.

Second, Plaintiffs' rush to get to the finish line will have immediate and severe impacts on the administration of the November 2022 general election. Because the Court's Order enjoins the Cancellation Provision, but *not* identical procedures under state law, it will inject confusion into county recorder offices across the State and jeopardize the accuracy of the county voter lists used in the upcoming election. Moreover, the injunction of the Felony Provision will likewise cause the State irreparable harm as it prevents the AG from enforcing duly enacted laws designed to deter and prosecute voter fraud.

Third, Plaintiffs will suffer no harm if the law is stayed pending appeal. The procedure codified by the Cancellation Provision has been in place for decades. If it was causing Plaintiffs irreparable harm, they would have noticed it well before September 2022 and presented actual voter affidavits to prove it. Outside of sensationalism, Plaintiffs did not even try to show even one actual impact on a voter or voter registration drive. Moreover, the AG and YCRC do not intend to appeal the injunction of the Felony Provision to the extent that it reaches Plaintiffs' voter registration activities. As such, Plaintiffs' only claimed harm from this provision is moot. What is most telling, however, is that if Plaintiffs sincerely feared irreparable harm, they would have moved for preliminary relief much earlier.

Fourth, issuance of a stay is in the public interest. SB 1260 was enacted to safeguard the integrity of Arizona's election system by ensuring all those who are qualified to vote in Arizona are able to vote—but only once. Because the law furthers this compelling State interest (which codifies existing practice) and because the General Election is already underway in Arizona, it is particularly inappropriate to shift current election procedures. *Purcell v. Gonzalez*, 549 U.S. 1 (2006).

Accordingly, the AG and YCRC respectfully request that this Court grant their Motion for Stay Pending Appeal.

## II. PROCEDURAL BACKGROUND

On June 6, 2022, Arizona's Governor signed SB 1260 into law, which took effect on September 24, 2022. [Doc. 20 at ¶ 1.] More than two months after the law was signed, Plaintiffs filed their Complaint on August 15, 2022, challenging SB 1260 on a variety of legal grounds. [Doc. 1.] On September 2, 2022, Plaintiffs filed an amended complaint. [Doc. 20.] Plaintiffs did not file a motion for preliminary injunction until Thursday, September 8, 2022—more than three weeks after Plaintiffs filed their initial complaint and three months after the law was signed. [Doc. 31.]

In contrast, at the September 14, 2022 return hearing, the Court set an expedited briefing schedule on Plaintiffs' Motion to take place over the course of one week. [Doc.

62.] On September 26, 2022, two days after SB 1260 went into effect, this Court issued an Order partially granting Plaintiffs' Motion for preliminary relief, enjoining the implementation of the Felony and Cancellation Provisions. [Doc. 87.]

Plaintiffs' timing is problematic. Arizona's 2022 General Election is underway. Election officials have already distributed the Military and Overseas Ballots, which are required to be mailed or sent out forty-five days before the election (September 24, 2022). A.R.S. § 16-543(A). Moreover, individuals may register or make changes to their voter registration until October 11, 2022, and election officials will mail early ballots and open voting centers on October 12, 2022. A.R.S. §§ 16-120(A), 16-542(A), (C).

Given the great importance in full implementation of the law and the now-ongoing General Election, time is of the essence. If this Court is not able to rule on their Motion to Stay by September 30, 2022, which was the same number of days afforded to Plaintiffs on their expedited timing demands, the AG and YCRC intend to seek an emergency stay and relief from the Ninth Circuit.

## III. ARGUMENT

This Court may suspend or modify its preliminary injunction during the pendency of an appeal. Fed. R. Civ. P. 62(d). In evaluating whether a stay pending review is appropriate, a district court will consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Courts take a "balancing approach" to this consideration and will grant relief if a movant demonstrates "either a probability of success on the merits and the possibility of irreparable injury, or that serious legal questions are raised and the balance of hardships tips sharply in [movant's] favor." *Leiva-Perez v. Holder*, 640 F.3d 962, 965–66 (9th Cir. 2011) (quoting *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998)).

Despite overlapping with the test for preliminary injunctions, the test for a stay pending appeal does not "require that the court in effect conclude that its original decision in the matter was wrong before a stay can be issued." *Evans v. Buchanan*, 435 F. Supp. 832, 843–44 (D. Del. 1977). "Rather, a stay may be appropriate in a case where the threat of irreparable injury to the applicant is immediate and substantial, the appeal raises some serious and difficult questions of law in an area where the law is somewhat unclear and the interests of the other parties and the public are not harmed substantially." *Id.* Here, the factors weigh in the AG's and YCRC's favor, and a stay pending appeal is appropriate.

### A. The AG and YCRC Raise Serious and Important Legal Questions and Are Likely to Succeed on the Merits.

It is proper for a district court to stay its "own order[] when [it has] ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained." *Protect Our Water v. Flowers*, 377 F. Supp. 2d 882, 884 (E.D. Cal. 2004) (internal quotations and citations omitted). This relief is "frequently issued" when "the trial court is charting a new and unexplored ground and the court determines that a novel interpretation of the law may succumb to appellate review." *Id.* (internal quotations and citations omitted).

As a case of first impression, this case raises "serious and difficult questions" of constitutional law and statutory interpretation "in an area where the law is somewhat unclear." *Evans*, 435 F. Supp. at 843–44. So much so that nearly every party in the case has a different interpretation of the statutory language. As detailed below, this Court's order hinges on the statutory interpretation of novel provisions of Arizona law, which is more appropriately addressed by the Arizona Supreme Court. Accordingly, the AG and YCRC's reasonable, alternative interpretation of SB 1260, primarily based on existing practices, raises serious legal questions sufficient to justify a stay.[1]

[1] The AG and YCRC are also likely to succeed on the merits for the reasons articulated in their preliminary injunction briefing and incorporates those arguments here by reference. [*See* Docs. 70, 77, 85, 86.]

**1. The Cancellation Provision Raises Serious and Difficult Questions of Statutory Interpretation.**

The AG and YCRC respectfully disagree with the Court's conclusion that SB 1260 and NVRA conflict. Rather, the Cancellation Provision can and should be read in harmony with the NVRA and other Arizona election laws. *Sciranko v. Fidelity & Gaur. Life Ins. Co.*, 503 F. Supp. 2d 1293, 1319–20 (D. Ariz. 2007) ("It is a well-settled canon of statutory construction that the provisions of a unified statutory scheme should be read in harmony . . . ." (internal citation and quotations omitted)); *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (reasoning that when a federal statute "is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption'" (internal citation omitted)). While the AG and YCRC will not address every reason for their disagreement with the Court's Order in this briefing, it is relevant to this Motion that the Court's decision rests on two conclusions of statutory interpretation that are susceptible to alternative interpretations, both of which are plausible and reasonable.

<u>First</u>, the Court construes (at 11) SB 1260 to apply to both out-of-state re-registrations and in-state re-registrations because "[n]othing in the text of [SB 1260] limits its application to only county recorders in Arizona." However, the term "county recorder" is used elsewhere in the relevant statute (and Title 16 more generally) to refer to *Arizona* county recorders. For example, Section 16-165(a) sets forth the conditions upon which a county recorder may remove Arizona voters from election rolls. It would make no sense to construe county recorders in that subsection to mean county recorders in any state. Courts assume that identical words have the same, consistent meaning throughout an act. *Benko v. Quality Loan Service Corp.*, 789 F.3d 1111, 1118 (9th Cir. 2015); *see also Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932) ("[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning."). That canon applies to the phrase "county recorder" in Title 16.

<u>Second</u>, the Court recognizes (at 12–13) that its interpretation of 52 U.S.C. § 20507(a)(1)(A) is inconsistent with the House and Senate Reports' construction of the

same provision: that a voter's re-registration in another county constitutes a voter's "request" to cancel his old registration. S. Rep. No. 103-5 at 31; H.R. Rep. No. 103-9 at 14–15. Not only is Congress' interpretation of Section 20507(a)(1)(A) reasonable, but it is also harmonious with provisions of Arizona law that provide a proactive, *in writing* voter re-registration with a new address will *change* the voter's registration, not add a second registration under a different address. *See* A.R.S. § 16-166(B) ("If the elector provides the county recorder with a new *registration form* or otherwise revises the elector's information, the county recorder *shall change* the general register to reflect the changes indicated on the new registration." (emphasis added)); A.R.S. § 16-164(A) ("On receipt of a new *registration form* that effects a change of . . . address . . . the county recorder shall indicate electronically in the county voter registration database that the registration has been canceled and the date and reason for cancellation."); A.R.S. § 16-101(B) (one residence rule); A.R.S. § 16-120(A) (noting voter is qualified to vote where he resides); A.R.S. § 16-123 (requiring that voter provide a proof of residence to county recorder when registering to vote); A.R.S. § 16-163(B) (requiring county recorders send a confirmation to the voter that voter was placed on that county's general register).[2] The new requirement imposed by the Court's Order—for the voter to complete a voter re-registration form and *also* get written notice of the re-registration action that just occurred—is not supported by NVRA or Arizona law.

The Court's heavy reliance on two Seventh Circuit cases in coming to its decision that the NVRA and SB 1260 conflict is misplaced. These non-binding cases are distinguishable, and it is entirely possible that the Ninth Circuit will adopt an alternative reading, especially based on the practical aspects of SB 1260.

In *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019), Indiana law "required that election officials cancel a voter's registration upon finding a match through

---

[2] At the very least, Arizona's statutory procedure and pro-active steps for verifying a voter's new residence supports construing a voter's re-registration at a new address as "confirm[ation] in writing that the registrant has changed residence to a place outside the registrar's jurisdiction" under Section 20507(d)(1).

the Crosscheck system," a third-party independent database "that confirmed a voter was registered in Indiana and in another state." [Doc. 87 at 9.] The court reasoned that "[d]rawing an inference from information *provided by Crosscheck* indicating that a voter has registered in another jurisdiction is neither a request for removal nor is it from the registrant." *Common Cause*, 937 F.3d at 960 (emphasis added).

Arizona's law differs in two important ways: First, Arizona does not rely on a third-party database, but on official voter registration forms *from the voter*. *See* A.R.S. § 16-165(A)(10), (B) (requiring the county recorder confirm with the new county recorder a voter's registration); A.R.S. § 16-161 (noting that a completed voter registration form constitutes "an official public record of the registration of the elector"); *see also Common Cause*, 937 F.3d at 961 (requiring that the "registrant herself make[] the request to the state" and declining to interpret NVRA to "encompass indirect information from a third-party database").

Second, unlike registrations in several states, Arizona law clearly delineates that when a voter re-registers to vote at a different address within the state, (a) the voter must verify that this address is their residence for purposes of voting; and (b) the re-registration will prompt state election officials to *change* a voter's state registration, not add a second, duplicate registration. *See* A.R.S. §§ 16-101(B), 16-120(A), 16-123, 16-164(A), 16-166(B). Because the re-registration form is verified by the voter herself, Arizona election officials do not rely on any "inference" like the one relied upon in Indiana.[3] Moreover, the voter is actually notified of the change of registration. A.R.S. § 16-163(B).

Regardless, even if a voter's registration is somehow erroneously cancelled (and Plaintiffs have not pointed to any such cancellation under the current system), the voter is still permitted to cast a provisional ballot that will be counted upon confirmation that the voter did not vote in the voter's previous precinct, thereby preventing disenfranchisement.

---

[3] For the same reasons, the Court's adoption of *Common Cause's* reasoning related to Section 20507(d) is distinguishable. *See Common Cause*, 937 F.3d at 961–62 (reasoning that Indiana's law did not fulfill Section 20507's written confirmation requirement because "Crosscheck is not the resident, nor is it the resident's agent").

A.R.S. § 16-584(B), (D). Again, this law codifies existing practices, and Plaintiffs never attempted to show even one erroneous cancellation under the existing system. On the other hand, the Court was presented with multiple examples of fraudulent voter registrations.

In *League of Women Voters of Indiana Inc. v. Sullivan*, 5 F.4th 714 (7th Cir. 2021), Indiana law allowed election officials to cancel a voter's registration upon receipt of notice that a voter was registered in another state. *Id.* at 724. The Court reasoned that that this law was inconsistent with the NVRA because it did not require the state to "have a copy of the voter's signed voter registration application" and thus "impermissibly allow[ed] Indiana to cancel a voter's registration without . . . direct communication from the voter." *Id.* at 724.

As discussed above, unlike the Indiana officials that relied on voter representations made to other states and the lack of a written verification (*e.g.*, actually having access to the voter re-registration form), Arizona is in direct communication with the voter by virtue of its possession of the actual registration form submitted by the voter herself. A.R.S. § 16-161 (a voter registration form constitutes "an official public record of the registration of the elector"); A.R.S. § 16-168(J) (requiring a centralized statewide voter registration database).

Accordingly, because the Court's statutory interpretation of SB 1260 and its interaction with the NVRA is a "novel" one in an area of law that "is somewhat unclear" and subject "to appellate review," the legal questions in this case are sufficiently serious and difficult to warrant a stay. *Protect Our Water*, 377 F. Supp. 2d at 884; *Evans*, 435 F. Supp. at 843–44. These questions of Arizona law may also be appropriate for certification to the Arizona Supreme Court.

**2. The Injunction of the Felony Provision Is Defective.**

Even if the AG and YCRC were not to prevail on their defense of the Felony Provision, the injunction of the Felony Provision has multiple defects that justify a stay.

<u>First</u>, as Plaintiffs failed to join county attorneys as parties, the injunction will not prevent or enjoin any other law enforcement agency in Arizona from enforcing SB 1260; plainly, this injunction does not redress the harm Plaintiffs seek to prevent. Although the Court recognized the AG cannot bind county attorneys [Doc. 87 at 6, n.1], there is no

explanation how the Court's injunction will bar county attorneys from enforcing the Felony Provision. *See*, *e.g.*, *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (Article III standing was lacking as "any injury would be traceable only to [the County election officials] and redressable only by relief against them."). This is a fatal flaw in Plaintiffs' case, as recognized by the Court at the hearing.

Second, the Court's injunction is overbroad because it enjoins applications of the Felony Provision that Plaintiffs have never asserted would cause them any harm—let alone any irreparable harm. *Stormans, Inc. v. Selecky*, 586 F.3d. 1109, 1141 (9th Cir. 2009). Plaintiffs' claimed harm was that the Felony Provision would supposedly interfere with their voter registration activities. But the preliminary injunction goes beyond the harm Plaintiffs claimed by not only enjoining enforcement of the Felony Provision as related to routine voter outreach activities such as voter registration, but also constitutional applications such as *knowingly* mailing early ballots to individuals registered to vote in another a state—something Plaintiffs do not even allege they or their members do. Moreover, the Attorney General specifically offered a construction for which neither this Court nor Plaintiffs identified any genuine vagueness concerns. It would have been more appropriate for the Court to codify the Attorney General's avowal in its order, rather than the blanket injunction. Any injunction that enjoins activities within the scope of this effectively unchallenged construction is necessarily overbroad.

To avoid an overly broad injunction, this Court could and should craft an injunction that only prevents enforcement of the Felony Provision as to the routine voter outreach activities raised by Plaintiffs. Put differently, the Court should only enjoin enforcement that falls outside the statutory construction offered by the Attorney General, [Doc. 70 at 9]—particularly as neither this Court's order nor Plaintiffs have explained why *that* interpretation is constitutionally problematic.

**B. The State and YCRC Will Suffer Irreparable Harm Absent a Stay.**

Given the timing of this Court's Order, and absent a stay, this Court's preliminary injunction will cause irreparable harm to election officials, local political parties like

YCRC, and Arizonans generally.

The 2022 General Election will take place on November 8, 2022. However, a voter's residence for purposes of voting in that election is locked in on October 11, 2022, twenty-nine days prior to election day, even if they move to another county after the statutory deadline. A.R.S. §§ 16-120(A) (establishing the deadline to register), 16-125 (deeming voters to be residents of their previous county if they move after the twenty-nine-day deadline).[4] In Arizona, individuals can only have one residence for voting purposes. *Id.* § 16-101. Further, Arizonans are only qualified to vote where they are registered as a resident. *Id.* § 16-120. It logically follows, then, that Arizonans can only be legally registered to vote at one address at any given time. As such, elimination of duplicate voters among the several counties is integral to election administration.

Because SB 1260 only codifies the counties' existing procedure for eliminating duplicate voters from their voter rolls, this Court's order enjoining SB 1260, but *not* the identical county procedure, will cause undue confusion regarding whether (and how) county recorders maintain the accuracy of their voter rolls. One county may proceed as usual, while another county will apply the Court's rationale to the existing procedure and stop ensuring accurate voter registration in Arizona. This is untenable. The Court's acceptance of Plaintiffs' speculative hardships only opens a Pandora's Box for election administrators *during* an actual election.

Inaccurate voter rolls would cause a host of irreparable harms. First, it would inhibit the State's election officials from accurately certifying their voter lists, something they have a statutory duty to do. *Id.* § 16-168; *see also Mi Familia Vota v. Hobbs*, 977 F.3d 948, 953 (9th Cir. 2020) (reasoning that an injunction of an election law so close to an election would cause irreparable harm because it "makes it considerably more difficult for [the Secretary] and other election officials to fulfill their statutory obligations in administering the

---

[4] The twenty-nine-day deadline for the 2022 General Election falls on Monday, October 10, 2022, which is recognized as a state holiday (Columbus Day). Pursuant to A.R.S. § 16-120(B), registrations received on the following business day are deemed timely received.

election"). Second, inaccurate voter rolls would cause confusion about where a voter is qualified to vote and could disenfranchise that voter if she votes in the wrong jurisdiction. Even worse, a voter might not be on the correct county's voter list due to confusion over how this Court's order affects the county's procedure for maintaining those lists. *See* A.R.S. §§ 16-101, 16-120. Third, inaccurate voter rolls will also dilute the votes of citizens who actually reside in the jurisdiction because it will enable individuals to fraudulently vote in a jurisdiction in which they are not qualified to vote.

Further, the State suffers irreparable harm any time it is precluded from carrying out the laws passed by its democratic processes. *See, e.g., Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[A] state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). Moreover, the State "'indisputably has a compelling interest in preserving the integrity of its election process.'" *Purcell*, 549 U.S. at 4. Last minute injunctions from courts which constrain the sovereign state's ability to enforce duly enacted laws intended to prosecute voter fraud not only harm the integrity of the electoral process, but also markedly decrease voter confidence. "[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008). "[T]he 'electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.'" *Id.* (quoting *Building Confidence in U.S. Elections* § 2.5 (Sept. 2005), App. 136–137 (Carter–Baker Report)).

Accordingly, it is vital that Arizona's election officials and enforcement agencies are able to maintain the status quo through the October 11, 2022 registration deadline.

**C. The Stay Will Not Substantially Injure the Plaintiffs.**

Plaintiffs' substantial delay in bringing this case belies any notion that they will be "seriously" injured by a stay. And to be sure, Plaintiffs will not be injured by a stay here.

Regarding the Cancellation Provision, that Provision simply codified *existing* practices for removing an individual from a voter roll. [*E.g.*, Doc. 70 at 9–12; Doc. 85 at 4.] Indeed, during the preliminary injunction phase, Janine Petty, senior director of voter registration for the Maricopa County Recorder, explained that under existing practice: "When the Recorder's Office receives confirmation from another county that a person registered in Maricopa County, registered to vote in that county the Maricopa County voter record is cancelled . . . ." [*See* Doc. 70-1 ¶ 6.] However, only parts of SB 1260 were enjoined by this Court's Order, not existing practices. Staying the injunction will simply return the parties to the status quo as it existed *before* SB 1260 was enacted.

Regarding the Felony Provision, the only harm that Plaintiffs have articulated is that this Provision might prohibit "voter registration and mobilization activities that are at the heart of Plaintiffs' organizational missions." [Doc. 31 at 14.] But as explained *supra* Section I.A.2, the AG and YCRC are *not* appealing the injunction to the extent that it prohibits prosecutorial entities from enforcing the Felony Provision against "voter registration and mobilization activities." In fact, the AG "flatly rejects any interpretation of SB 1260 that would criminalize such ordinary voter outreach." [Doc. 70 at 15.] Thus, Plaintiffs' voter registration and mobilization activities will not be threatened by the Felony Provision, regardless of whether a stay is issued. As such, Plaintiffs will not be "seriously" injured by a stay.

**D. <u>A Stay Is in the Public Interest</u>.**

A stay of the Court's Order is definitively in the public interest. As YCRC knows all too well, voter fraud is present in Yuma County and on the rise. [Doc. 85 at 30–32 ¶¶ 12–19, 21.] "Voter fraud drives honest citizens out of the democratic process" because voters "who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell*, 549 U.S. at 4; [*see also* Doc. 85 at 31–32 ¶¶ 19–20 (detailing how voter fraud has had a measurable impact on YCRC's membership)].

SB 1260 provides comfort to Arizonans that voter lists are accurate, and it further disincentivizes behavior that enables non-resident participation in Arizona elections. In

doing so, it furthers the integrity of Arizona elections by ensuring that only those qualified to vote in its elections are able to vote. A "State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. S.F. Cnty. Democratic Central Comm.*, 489 U.S. 214, 231 (1989) (per curium); *see also Purcell*, 549 U.S. at 4 ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.").

As referenced, the Court's Order enjoining SB 1260, a reasonable election law, injects uncertainty into the process for maintaining accurate voter lists in the critical period before the election. "[F]ederal district courts ordinarily should not enjoin state election laws in the period close to an election." *Merrill v. Milligan*, 142 S.Ct. 879 (2022) (Mem.) (Kavanaugh, J., concurring). Indeed, "[c]ourt orders affecting elections . . . can . . . result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4–5. Because the operative deadline for voter registration lists is October 11, 2022—a mere two weeks away—this risk is high.

When this risk is weighed in conjunction with the public interests served by issuing the stay and Plaintiffs' "extremely late filing relative to the deadline," the balance of hardships tips sharply in the AG and YCRC's favor. *See Mi Familia Vota*, 977 F.3d at 953. As such, even if the AG and YCRC only raise "serious questions" as to the validity of SB 1260 (they have), this is sufficient to issue a stay.

## IV. CONCLUSION

For the foregoing reasons, the AG and YCRC request that this Court stay its September 26 Order preliminarily enjoining SB 1260 pending the resolution of their appeal.

DATED this 27th day of September, 2022.

MARK BRNOVICH
ATTORNEY GENERAL

By: *s/ Jennifer J. Wright (w/ permission)*

Brunn ("Beau") W. Roysden III (No. 28698)
Drew C. Ensign (No. 25463)
Jennifer J. Wright (No. 27145)
*Assistant Attorneys General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
acl@azag.gov

*Attorneys for Arizona Attorney General Mark Brnovich*

SNELL & WILMER L.L.P.

By: s/ *Brett W. Johnson*

Brett W. Johnson
Eric H. Spencer
Colin P. Ahler
Tracy A. Olson
SNELL & WILMER, LLP
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
(602) 382-6000
bwjohnson@swlaw.com
espencer@swlaw.com
cahler@swlaw.com
tolson@swlaw.com

*Attorneys for Intervenor-Defendant Yuma County Republican Committee*

**CERTIFICATE OF SERVICE**

I certify that, on September 27, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, which automatically sends a Notice of Electronic Filing to all counsel of record.

s/ Tracy Hobbs